WALTER H. STRONG v. THE IOWA CENTRAL RAILWAY COMPANY, Appellant.

**Railroads:** NEGLIGENCE. Increasing the speed of an engine, suddenly and without notice, after it has been slowed on signal in order to permit a coupling, warrants a finding of negligence.

**Assumption of Risk.** Knowledge that a coupling apparatus is defective does not waive right to recover for injury due to a sudden increase of the speed of an engine, while the coupling is being made.

SAME. Nor is such knowledge a bar where a brakeman, knowing that a collision must ensue if the coupling be not at once made, makes it, on order from the engineer. *Perigo v. R'y*, 52 Iowa, 278, and *Thoman v R'y*, 92 Iowa, 196, *distinguished.*

**Waiver:** RULE. Disobedience to a rule does not defeat a recovery if the officers of the road knew it to be the general practice of employes to disregard such rule.

**Practice:** PLEADING. Plea, that an engine and its appliances were defective. Evidence tends to show that injury was due either to such defects or to negligent use. There was no claim that the pilot bar, as such, was defective. *Held*, it was proper to submit whether injury was caused by defects in the pilot bar.

**Verdict:** NOT EXCESSIVE. One for one thousand five hundred dollars where a finger is lost, the use of a hand impaired and earnings are decreased fifteen dollars a month, is not excessive.

*Appeal from Marshall District Court.*—HON. D. R. HIND-
MAN, Judge.

SATURDAY, APRIL 6, 1895.

Action to recover damages for a personal injury.
Verdict and judgment for plaintiff. Defendant
appeals.—*Affirmed.*

*Anthony C. Daly* and *T. F. Bradford* for appellant.

*J. L. Carney* for appellee.

Kinne, J.—I.   The negligence pleaded in this case
is: *First,* in the operation of the engine, in that by
carelessness of the engineer, or by reason of defective
brakes, valves, and machinery, the engine was per-
mitted to make a sudden jerk or start, when it should
have moved steadily and slowly towards the car to per-
mit the coupling to be made, also that the engineer,
without a signal from plaintiff for an increase of speed,
and without giving plaintiff any warning, started the
engine so quickly, and in such a careless and negligent
manner, as to catch plaintiff's hand, leg, and body,
whereby he was injured.   And, *second,* in failing to
equip its engine with and to use a proper pilot bar, or
rather a pilot bar properly supported.   The several
acts of negligence are pleaded with great minuteness
and elaboration.   The defendant pleaded by way of
general denial only.   The case was tried to a jury, and
a verdict returned for plaintiff for one thousand five
hundred dollars.   Special interrogatories were asked
and refused, and many were given.   Exceptions were
taken to the giving of some of them, as well as to the
refusal to give those asked by defendant.   So far as
material to the questions to be decided, these will here-
after be considered.   Defendant moved for a verdict

at the conclusion of the evidence, which motion was overruled, and an exception taken. After the coming in of the verdict, defendant moved for judgment notwithstanding the verdict, which motion was overruled, and an exception taken. Defendant also moved to set aside the answers to certain special interrogatories, and for a new trial. Both these motions were overruled, and the ruling duly excepted to. Judgment was entered upon the verdict.

II.   To fully comprehend the questions herein presented and decided, it is important that we state the facts surrounding the accident as disclosed by the record. March 9, 1893, plaintiff—who had prior thereto been in the employ of defendant company in various capacities for about four years—was the head brakeman of a freight train upon defendant's line of railway, which was proceeding from the city of Oskaloosa northward. There were eighteen loaded cars in the train. The train reached a small station called "Moore" about ten minutes prior to the time at which a passenger train No. 2 from the north was due to pass Moore station, viz., at 7:01 P. M. The passenger train did not stop at this station. A rule of the company, known to its employes, required that the main line track should be clear for the passenger train for ten minutes prior to the time when it was due. Another rule required that the "trains taking side track will always, when practicable, enter at the nearest end." While it was dangerous to head in on the side track at this place, and to couple the front of the engine to a box car which was standing on the side track, and which must be moved in order to let the freight train pass off of the main track on to the side track, still it was practicable so to do. When the freight train arrived at Moore station, plaintiff got off, and ran ahead to turn the switch, so as to let it pass

on to the side track. It was then within six minutes
of the time when the passenger train was due. The
engineer gave plaintiff the orders to head in on to the
switch. Plaintiff objected on account of the danger,
but proceeded to obey the orders. To control the car
which was standing upon the side track, it was neces-
sary to couple the front end of the engine to it. As
plaintiff got to the switch, he heard a whistle, and, sup-
posing it was No. 2, ran down the track and flagged it.
It proved to be an extra train. He then went back
where the car stood, put the pin in the drawbar in a
slanting position, and then went to meet the engine.
He gave a slow signal to the engineer, seeing the
engineer at the time, and mounted the pilot of the
engine for the purpose of making the coupling. The
pilot bar on the engine had to be inserted in the draw
bar of the car in order to make the coupling. This bar
attached to the engine was about four feet long, and
was fastened to the engine on the pilot deck. The
other end rested loose on the nose of the pilot, and
within about eight inches of the ground. This bar
weighed one hundred and thirty-five pounds. In mak-
ing the coupling it was necessary to step upon the pilot
at a place provided for that purpose, and to stoop down,
take hold of the bar with both hands, and raise it high
enough so that the loose end could enter the aperture
in the end of the drawbar in the car. While plaintiff
was holding the pilot bar in this position, and when
within about six feet from the car, the engine's speed
was suddenly, and without signal from plaintiff or
warning to him, increased, and, the pilot bar not being
quite high enough to enter the drawbar of the car, the
pilot was driven close to and under the end of the car,
catching plaintiff's hand, leg, and body between the
drawbar of the car and the pilot of the engine, and hold-
ing him there until he was released by the backing of

the engine. The motion of the engine was a sudden plunge, and after the speed was thus increased it was impossible for plaintiff to get out of danger. His hand was mashed, one finger had to be amputated, and his leg was injured. It appears that the engine in controversy was what is known as a "Mogul." The defendant company had on its line of road ten engines of that class, and six of the ten had pilot bars adjusted as this one was. The other four had a rod fastened to the pilot, which held the pilot bar in a stationary position, high enough for it to enter the end of the drawbar of a · car. They also had a link in them so that in making the coupling you raised the link only, and inserted it in the end of the drawbar of the car. This appliance is used upon engines upon the Chicago, Burlington & Quincy Railroad, but not on the Diagonal or Chicago & Northwestern Railway. The engineer objected to running past the depot on the main line, and backing in at the north end of the switch. It appears that he knew this extra train was coming.

The following rules of the company for the government of its employes were introduced in evidence:

"Rule 24. Conductors, brakemen, and switchmen, in coupling or uncoupling cars, must not assume that signals given to the engineer or fireman will be obeyed. When obedience to a signal thus given by a conductor, brakeman, or switchman to an engineer or fireman is essential to the safety of the conductor, brakeman, or switchman in the performance of a duty, he must know that the signal has been understood and obeyed before he places himself in a position of danger relying upon such obedience. When he acts without such knowledge, he assumes all risks of the danger arising from such misunderstanding or disobedience of signals.

"Rule 25. Every employe is hereby warned that it is his duty before exposing himself, or his fellow employes, to danger, to examine the condition of all machinery, tools, cars, engines, trucks, links, pins, drawheads, drawbars, etc., that he is required to use in the performance of his duty, first satisfying himself that they are in safe working order. It is the duty of every employe to take sufficient time to make such examination, and to refuse to obey any order which exposes him or his fellow employes to danger.

"Rule 26. A perfect familiarity of these rules will be expected of all employes of the road. Ignorance of their requirements will not be received as an excuse for not obeying them. If in doubt as to the meaning of any rule or special instructions, application must be made at once to the proper authority for explanation.

"Rule 27. The fact that any person enters or remains in the service of the company will be considered as an assurance of willingness to obey its rules. No one will be excused for the violation of them."

III. Error is assigned as to the fifth instruction given by the court. It is touching the duty of the defendant to use reasonable precautions for the safety of its employes, and to furnish suitable machinery and appliances, and they must be such as are "reasonably best calculated to answer the ends proposed." In the beginning of the instruction, the court states that the plaintiff claimed that injury resulted from "negligence of the defendant's employes, as well as on account of defects in said engine and the pilot bar to said engine." It is said there was no such issue, and no evidence that the engine or its pilot bar were defective. It is charged that the engine and its appliances were defective, and the evidence showed that either because of the defects in the engine or its appliances, or because of its negligent management, the

injury occurred.    True, it was not claimed that the
pilot bar, as such, was defective.    The claim as to it
was that the company was negligent in not using a
pilot bar of the improved pattern which was held up in
place for coupling.    We think, in view of other instruc-
tions, that though in this respect the statement of the
court was not entirely accurate, still it could not have
misled the jury.    Whether the pilot bar in fact used
was a proper appliance for the purpose of making the
coupling, or whether the company was negligent in not
equipping the engine with the other style, was a ques-
tion which the court properly submitted to the jury,
under all the facts and circumstances disclosed in the
case.

·    IV.   Complaint is made of the eighth instruction.
It reads thus:   "(8) If you shall find from the evidence
that the plaintiff was guilty of any negligence that con-
tributed to his injury by knowingly attempting to make
the coupling in question, in violation of a rule which
required him to know his signal was obeyed before
entering upon the performance of his work, then he
cannot recover in this action; and you should return a
verdict for the defendant, unless you should further
find from the preponderance of the evidence that the
defendant company had knowledge that such rule was
not being obeyed, and waived obedience to such
rule."    This instruction refers to rule 24, here-
tofore set out.    The evidence shows that this
rule was disobeyed, and that it was the general practice
of the employes to disregard it; that it was so disre-
garded in the presence of the company's officers in the
yards at Marshalltown.    We see no force in the claim
that because there is no evidence that this rule was dis-
obeyed at the station, out upon the road, in presence
of the officers, therefore it should not be held to be
waived.    It matters not how or when the knowledge

of such disobedience came to the officers of the defendant. Indeed, we have held that "it need not appear that the officers of the defendant who are charged with enforcement of its rules had actual knowledge of the custom of the defendant's employes as to violating the rule. Such notice or knowledge may be inferred from the circumstances; it may be implied from the notoriety of the custom, whereby they are chargeable with notice." *Lowe v. Railway Co.*, 89 Iowa, 420, where this question is fully considered; *Horan v. Railway Co.*, 89 Iowa, 328. Furthermore, the evidence is undisputed that the employes of the road could not obey this rule, and do the work incident to their positions. Such being the case, it would seem that the rule must have been enacted to serve some purpose other than the protection of the property of the defendant, or the proper conduct of its business, or the safety or protection of its employes. A rule which, if obeyed, would prevent the defendant from properly carrying on its business, does not commend itself to the courts as being made in good faith, and in furtherance of any legitimate purpose. Having failed to plead the rule, defendant was not entitled to avail itself of it in defense. *Nicholaus v. Railway Co.*, 90 Iowa, 85; *Independent Dist. of Burlington v. Merchants' Nat. Bank*, 68 Iowa, 343; *Mayes v. Railway Co.*, 63 Iowa, 562. Treating it, however, in view of the court's instructions, as being properly before the jury, the defendant has no just ground of complaint, as the evidence tended to show a waiver of it with knowledge of defendant's officers.

V. Complaint is made of the tenth instruction. We need not set it out. Regardless of the fact that the defendant did not plead the rules now relied upon, we discover no reversible error in the instruction. Some of the matters complained of are referred to in other parts of this opinion.

VI.   The ninth paragraph of the charge to the jury is also objected to.   It reads:   "(9) If you shall find, from a preponderance of the evidence in this case, that the plaintiff, in attempting to make the coupling in question, without any negligence on his part, occupied a position of danger in attempting to make such coupling, with the knowledge of the engineer in control of the engine, then you should further find that it was the duty of the engineer of said train, having such knowledge, to use all reasonable care and caution to avoid injuring the plaintiff; and if you shall further so find that the plaintiff was not guilty of any negligence that contributed to his injury, but that the injury to the plaintiff was caused by a sudden jerking or starting of the engine at the time he was endeavoring to make such coupling, and that such sudden jerking or starting of the engine was done without any signal from the plaintiff, but was so done by the defendant's engineer with full knowledge of the situation then occupied by the plaintiff, then, and in such case, such act of jerking and starting the engine would constitute negligence on the part of the defendant, and would justify you in returning a verdict for the plaintiff in this case."   It is said that the court has supposed a state of facts not proven.   We think the evidence fully warranted the giving of this instruction.   The negligence referred to in the instruction was pleaded, and the evidence without conflict sustained the allegation.

VII.   Some question is made as to the correctness of the court's ruling upon the admission of evidence. It is said that there was error in sustaining the objection to the defendant's question as to whether it was practicable to head the train in on the side track.   If there was error in this, it was without prejudice, as the information sought was elicited from the witness during the further progress of the examination.   And it is

urged, that in admitting the evidence as to the custom to violate the rules, there was error. The evidence was proper. There is no rule of law which prevents parties to a contract from waiving some of the provisions if they see fit. It would be a manifestly unfair and inequitable administration of the law which would permit a corporation to publish rules for the government of its employes, and to tacitly or openly consent to their being constantly disobeyed, and, when an action is brought by an employe injured in the service, to rely upon such a rule as a defense to the action. Rules made for legitimate purposes are proper as a protection to life and limb, and essential to the orderly conduct of business, and when enforced, or in good faith attempted to be enforced, meet with the commendation of courts; but it is permissible for the injured party to show, if he can, such a state of facts as clearly indicates that a rule was waived by the knowledge and consent of the parties claiming protection under it.

VII. It is claimed that the interrogatories 7, 13, 14, 15, and 16, asked by the defendant, should have been submitted to the jury. Some of them were substantially submitted in those given to the jury; others did not call for ultimate facts, and were properly refused; and, generally, we may say there was no error in this respect. The jury specially found that the plaintiff was not negligent, contributing to the injury, and that the defendant was negligent, and that such negligence contributed to produce the injury complained of. Counsel urge with much earnestness that these answers are not in harmony with the evidence. Counsel, we think, do not properly view the testimony. Their claim is that the testimony of the plaintiff shows that he signaled to the engineer to stop, and that his signal was not obeyed; that the jury specially found that the

signal was obeyed; hence there could have been no negligence in that respect on defendant's part; and that plaintiff proceeded to make the coupling in violation of rule 24. A fair consideration of the evidence shows that plaintiff signaled the engineer to slow up his engine, so as to permit plaintiff to make the coupling. The engineer did, in response to the signal, slow up, but afterwards, and when the engine was within a few feet of the car, suddenly, and without notice or warning, and without signal, increased the speed of the engine, thereby producing the injury. It will not do to say that the testimony, and all the circumstances, show that the engineer was expected by the signal to come to a full stop. Such an act would not have been in furtherance of the object which was to be accomplished,—making the coupling. The testimony is that the plaintiff gave a slow signal to stop. It is evident that the engineer knew what that meant, for he at once acted upon it, and slowed the train. It is true that, on cross-examination, plaintiff testified he gave a signal to stop, and that the engineer did not obey the signal. But when all the evidence is considered together, with the situation of the parties, and the purpose they wanted to accomplish, it is clear that the signal was to so slow the movement of the engine and the train as to permit plaintiff to make the coupling. So the signal was obeyed, in so far as that the speed of the engine and train was at once slowed. The fact that afterwards the engineer suddenly increased the speed fairly accounts for the plaintiff's statement that his signal was not obeyed, for he all the time testified that after he gave the signal the movement of the engine and train was slower up to the time when the engine took the "plunge," as he calls it. In this view the jury were warranted in finding as they did, and that defendant was negligent.

IX. In view of the proper construction to be placed upon the testimony as above stated, and of the findings of the jury, rule 24, heretofore set forth, has no bearing upon the case, for we hold, and the jury so found, that the signal was obeyed by the slowing of the train. Hence plaintiff had a right to assume after the speed of the train had been slowed in response to his signal, that it would not be suddenly increased thereafter, without his orders, and without notice to him. He was then justified in attempting to make the coupling. *Lowe v. Railway Co.;* 89 Iowa, 420; *Nicholaus v. Railway Co.,* 90 Iowa, 85; *Nichols v. Railway Co.,* 69 Iowa, 155. The engineer knew that the brakeman was standing upon the pilot. He knew what he was there for. He must have known that his position was a dangerous one, and it was his duty to continue to run slowly to permit plaintiff to make the coupling. In violation of this duty, he, when the pilot was about six feet from the car, suddenly ran the engine against the car. His act was negligence. The negligence charged in this respect was not in the failure of the engineer to obey the signal. It was that, after obeying it so far as to slow the speed of his train, he suddenly, and without warning, accelerated the speed, thereby causing the injury. In one respect, at least, this case is peculiar. Neither the engineer, nor any of the trainmen, testified touching the facts surrounding this accident. Plaintiff's testimony stands uncontradicted. It is said plaintiff should not recover, as the accident was the result of doing the business he undertook to perform; that, knowing the kind of a pilot bar in use on this engine, if he used it, and an injury thereby resulted, he is without remedy. If it be conceded that the plaintiff assumed the risk of attempting to make a coupling with the style of pilot bar in use on the engine in controversy, it is clear he did not

assume a risk incident to the careless and negligent conduct of the engineer in recklessly and suddenly, without notice or warning, running the engine into the car. Again, plaintiff, in attempting to make this coupling, was acting under the orders of his superior. He knew that in less than six minutes a passenger train was due at this station. He knew that the train did not stop. He knew that if the coupling was not made, and the main line track cleared, there would be imminent danger to the passengers on that train. Under such circumstances, he, in using this pilot bar and in attempting to make the coupling, did not waive his right of action for the injury he received. *Greenleaf v. Railroad Co.*, 29 Iowa, 14. No doctrine could be more pernicious and dangerous than to hold that, under the circumstances disclosed in this case, the brakeman would be justified in refusing to make the coupling, because to do so with that pilot bar was dangerous, more so than with the improved style of bar, and thus breed disobedience to orders of a superior officer, at a critical moment, when such disobedience might, and no doubt would, result in wrecking the passenger train, and in the loss of the lives of those being transported thereon. The business of operating trains safely demands that the servants of the company shall obey those in authority over them; especially so in this case, where disobedience meant peril to the lives of those on the approaching passenger train. The doctrine of assumption of the risk and waiver can have no place or force, under such circumstances. It may seem that some of the language of the opinion in *Perigo v. Railroad Co.*, 52 Iowa, 278, announces a different rule from that we have stated. It will be observed, however, that the facts of that case are unlike those in the case at bar. In that case the deceased was not working under immediate orders of a superior

officer, nor was there peril to the lives of others in case he refused to perform the work.   Nor is *Thoman v. Railway Co.,* 92 Iowa, 196, in conflict with the views we have expressed.   In that case the employe, though proceeding to obey an order of his superior officer, had the choice of two ways, the one safe, the other dangerous. He chose the latter, and was injured, and it was held contributed to the injury, and could not recover.   In the case at bar there was no choice of ways to accomplish the coupling.   In any event, the work was dangerous.

X.   Finally it is urged that the verdict of one thousand five hundred dollars is excessive.   The plaintiff sustains the loss of one finger.   He had his hand crushed.   It appeared that the use of the hand is greatly, and probably permanently, impaired. He formerly earned on an average of sixty dollars per month.   He now earns forty-five dollars per month.   We do not think the verdict excessive.   We have examined the entire record with care, and discover no prejudicial error.—*Affirmed.*