[No. 1830]

## ROBERT M. BURCH, RESPONDENT, *v.* SOUTHERN PACIFIC COMPANY, APPELLANT.

1. JURY—CHALLENGE—BIAS.

The general abstract bias which a juror may entertain when he expresses a sympathy for plaintiff in an injury case, because of his unfortunate condition resulting from the accident, where he believes that he can set aside such sympathy, and render a just verdict on the evidence and instructions, is not sufficient to disqualify him, under civil practice act, sec. 164, subd. 7 (Comp. Laws, 3259), providing that challenges for cause may be taken on the ground of the existence of a state of mind in the juror evincing enmity against or bias to or against either party.

2. APPEAL AND ERROR—REVIEW—HARMLESS ERROR—DENIAL OF CHALLENGE FOR CAUSE.

Even though the court errs in denying a challenge of a juror for cause, if the complaining party has peremptory challenges remaining, the peremptory challenging of the same juror cures the error, unless the party was thereby forced to exhaust its peremptory challenges, and was deprived of the substantial right to use the challenge on some other juror.

3. APPEAL AND ERROR—REVIEW—DAMAGES.

There being no absolute rule of compensation in personal injury actions, the supreme court should not interfere with a verdict giving damages, unless it clearly appears that there has been a mistake of principles on which the damages were estimated, or some improper motive or bias indicating passion or prejudice of the jury.

4. APPEAL AND ERROR—REVIEW—VERDICT.

After two or more successive and concurring verdicts, the appellate court will be strongly disinclined to interfere with the last verdict, unless it is plain that the verdict is founded on evidence not tending to prove a material fact necessary to recovery, or is in palpable disregard of the evidence.

5. DAMAGES—PERSONAL INJURIES—EXCESSIVE DAMAGES.

Plaintiff when injured was thirty-seven years old, earning from $95 to $100 per month, and was gradually advancing in defendant's employ. He was struck by a switch stand while boarding a caboose, was thrown upon the track, the cars running over his left leg and right foot, necessitating amputation of the left leg three inches above the knee and three toes of his right foot. He grew weaker physically, and lost from fifteen to eighteen pounds. An artificial leg could be worn at times, but it irritated the stump and made it sore. His right foot pains him severely if he rests his weight on it for any length of time. *Held*, that $20,000 damages was not so great as to evidence passion or prejudice.

6. APPEAL AND ERROR—REVIEW—HARMLESS ERROR—ARGUMENT OF COUNSEL.

Argument of counsel in a personal injury action against a railroad, referring to the fact that defendant had removed the case to the federal court, and that the circuit court of appeals had remanded it to the

state court, while improper, was not reversible error, where the jurors already knew that the case had been removed, and the court in its instruction bound the jury to return their verdict upon the evidence and law.

7. MASTER AND SERVANT—INJURY TO SERVANT—ACTIONS—QUESTION FOR JURY—AUTHORITY OF SERVANT.

In an action by a servant against a railroad company for injuries from being struck by a switch stand while boarding a car, whether a yardmaster and trainmaster had authority to promise plaintiff to repair the switch stand so as to bind defendant, whether plaintiff notified them, and, if so, whether they promised to repair, *held*, under the evidence, for the jury.

8. MASTER AND SERVANT—DEFECTS—PROMISE TO REPAIR—DELEGATION OF MASTER'S DUTY.

Where a servant is hired by those with authority to employ men for the master, and consequently with power to promise, on behalf of the master, to repair defective machinery, and they are notified of a defect by him and promise to repair, but neglect it, and the servant relying thereon continues at work and is injured, the master is liable.

9. TRIAL—INSTRUCTIONS—ISSUES COVERED BY CHARGES GIVEN.

Where charges given fully cover the law in accordance with the issues raised by the pleadings and evidence, the refusal of another charge is not error.

10. MASTER AND SERVANT—RULES FOR GOVERNMENT OF SERVANTS—NON-OBSERVANCE.

Where a railroad company enacted a rule regarding the boarding of moving cars, which rule was universally disregarded by servants to the knowledge of the company, and not enforced by the railroad company, the company could not avoid liability for injuries to a servant while mounting a moving car because of his disregard of the rule.

11. TRIAL—INSTRUCTIONS—MODIFICATION.

A court may refuse to give a partially erroneous instruction, and may so modify it as to conform to the pleadings; and, where in an injury action against a railroad company the complaint alleged that plaintiff was injured by striking a switch stand, and the answer denied it, a charge that if plaintiff attempted to board defendant's caboose, missed his handhold thereon or footing upon the step, and by reason thereof fell "or" was dragged along the track, and thereafter fell "or" struck the switch stand, defendant should recover, was properly modified to state that, if plaintiff attempted to board defendant's car "and" missed his handhold thereon or his footing upon the step and by reason thereof fell or was dragged along the track, and thereafter fell, and the fall resulted in his injury, defendant should recover.

12. TRIAL—INSTRUCTIONS—REQUESTS COVERED BY CHARGES GIVEN.

Requests covered by charges given are properly refused.

13. APPEAL AND ERROR—REVIEW—VERDICT ON CONFLICTING EVIDENCE.

A verdict on conflicting evidence should not be disturbed, unless there is a clear preponderance of evidence against it, or the court can say that the jury was swayed by improper motives from rendering a just verdict.

14. APPEAL AND ERROR—REVIEW—REFUSAL OF NONSUIT.
> In considering the granting or refusing of a motion for nonsuit, the appellate court must take as proved every fact which plaintiff's evidence tends to prove and which is essential to his recovery, and every inference of fact that can be legitimately drawn therefrom, and give plaintiff the benefit of all legal presumptions arising from the evidence.

15. NEGLIGENCE—TAKING CASE FROM JURY—CONTRIBUTORY NEGLIGENCE.
> An injury case should not be withdrawn from the jury when reasonable men might fairly differ on questions of fact whether plaintiff was guilty of contributory negligence, and the conclusion that follows as matter of law, unless the testimony is so conclusive as to compel the court to set aside a contrary verdict.

APPEAL from the District Court of the Second Judicial District of the State of Nevada, Humboldt County; *W. H. A. Pike,* Judge.

Action by Robert M. Burch against the Southern Pacific Company. Judgment for plaintiff, and defendant appeals. **Affirmed.** Petition for rehearing. **Denied.**

The facts sufficiently appear in the opinion.

*Guy V. Shoup* and *E. M. Bagley,* for Appellant:

I. The court erred in denying the challenge of defendant to Juror Nofsinger, upon the ground that the examination disclosed a frame of mind, wherein the juror said that the crippled condition of the plaintiff created in his mind a feeling that would cause him to lean towards the plaintiff and against the defendant; and defendant hereby refers to the testimony of said juror as written out by the shorthand reporter, and, in support of such assignment of error, defendant relies upon the grounds stated in the objection and exception noted to the ruling of the court.

Juror Nofsinger's answers on his *voir dire* indicated a disqualifying state of mind—entertaining a feeling that plaintiff's misfortune (loss of a leg) would operate on his sympathies, influence his judgment and cause him to lean towards the plaintiff. The legal conception this layman was struggling to express, as indicated by his answers, showed that he was an incompetent juror, and it was prejudicial error to deny defendant's challenge. His answers indicated he would have been biased in favor of plaintiff and would not have been a fair

juror for defendant.    The mere fact that the juror, after indi-
cating a frame of mind evidencing bias, says, as Nofsinger did
in his answer to the last question of the court, that he could
try the case fairly, is not conclusive.    To repeat the words of
Hawkins, "it is vain for a man to say, or even believe, that he
can judge impartially of a matter which he has already deter-
mined." In *Ry. Co.* v. *Chance*, 45 Pac. 60, a juror stated that
as between a railroad company and an individual he would
perhaps lean to the individual.    The Supreme Court of Kansas
said, at page 62: "The court erred in overruling defendant's
challenge for cause of William Dye as a juror.    He seems to
have been fair and straightforward in answering the questions
of court and counsel, and he might have been entirely fair in
the consideration of the case; but as he felt that it would
require a continual effort on his part to deal with the railroad
company in the same way that he would an individual, and
that, perhaps, he could not consider the case in an impartial
way, it was the duty of the court to excuse him.    *   *   *
The defendant having exhausted all its peremptory challenges,
the error will be considered material, although the juror was
afterwards discharged on peremptory challenge."

In *Quill* v. *S. P. Co.*, 140 Cal. 268, the Supreme Court of
California reversed a judgment in favor of the railroad com-
·pany where the court declined to excuse and plaintiff was
compelled to exercise a peremptory challenge to get rid of a
juror (Farquharson) who stated on his *voir dire* that he "felt a
prejudice against suits to recover damages, believing that many
such were brought without merit"; * * * "it might be that
my state of mind might influence my decision." * * * "I
admit that I might be affected unconsciously."

Speaking of a juror's assurance that, notwithstanding his
feelings or notions, he could still try the case fairly, the court
said: "Even in many of these cases, notwithstanding the posi-
tive declaration of the juror, * * * this court has felt com-
pelled to reverse the ruling of the trial judge, because, upon a
consideration of the whole testimony, it has seemed manifest
that the juror could not do that which he so positively declared
his ability to do; for, as was said in *People* v. *Gehr*, 8 Cal. 359,
'Few men will admit that they have no sufficient regard for

truth and justice to act impartially in any matter, however much they may feel in regard to it, and every day's experience teaches us that no reliance is to be placed in such declarations.' "

Even where by his formal answers a juror brings himself within the letter of the statutory qualifications, if the court should discover the least symptom of unfairness or prejudice, he should be rejected. (*Omaha R. Co.* v. *Cook*, 37 Neb. 435.)

The character of this action, the extent of plaintiff's injury, necessitated that greatest care be exercised by defendant's counsel and the court to secure a fair and impartial jury. The record shows defendant exhausted all its peremptory challenges, including the one on Nofsinger; but we think the result shows it had need to exercise more.

We earnestly invite the court's attention to the recent case of *Fitts* v. *Southern Pacific Co.*, 86 Pac. 710, which upholds our contention that the error here discussed was prejudicial.

II.    The damages awarded by the jury were excessive and were given under the influence of passion and prejudice. The only means of discovering passion and prejudice is by comparing the amount of the verdict with the evidence before the trial court. (*Doolin* v. *Omnibus Cable Co.*, 125 Cal. 141.) Where the amount of damages is in the discretion of the jury, it must be a reasonable and not an unlimited discretion, and must be exercised intelligently and in harmony with the testimony before them. (*Sloane* v. *R. R. Co.*, 111 Cal. 768.)

The jury gave Burch $20,000, and if we compound the interest on this $20,000 judgment, for twenty-nine years, according to the bankers' table of one dollar per annum, at compound interest, we find that he has been awarded the equivalent of the princely sum of $141,231.34, certainly a great deal more than any switchman, or, in fact, almost any man, is ever endowed with after having lived two-thirds of his expectancy.

At legal interest the $20,000 judgment awarded Burch would allow him $116.66 a month, or $1,400 a year, more than the total of his previous yearly earnings. For the period of his expectancy the accruing interest on that sum would amount to $40,600. This, in addition to the $20,000 judg-

ment, or principal sum, which he would always have on hand, making his money recovery on account of this accident $60,000.

Plaintiff, according to his testimony, is forty-one years of age. At the time of the injury he was earning as switchman $95 to $100 a month, between $1,100 and $1,200 a year. At the time of the trial he was running a star mail route under contract for $600 a year, and farming ground netting him $150 a year, making his net income now approximately $750 per annum; that is, between four and five hundred dollars less in income a year by reason of his injury. Assuming that he would live to the scriptural limit of "three score and ten," he would lose that difference for twenty-nine years, a total loss, figuring it at $500 per annum, of $14,500. However, that is not the correct rule of ascertaining his money loss. Judgment was reversed in *St. L. & S. F. Ry. Co.* v. *Farr*, 56 Fed. 994, in a personal injury case, where plaintiff's attorney in his argument said that the jury should multiply plaintiff's yearly loss of earnings by his expectancy, the court saying that that did not correctly state the rule and was unfair and misleading.

To pay that sum now would be requiring defendant to pay now the total of what he would admittedly only get in yearly installments, extending over a period of twenty-nine years. That is not the true measure. The correct rule is, as was said in *Burns* v. *Penn. R. Co.*, 68 Atl. 705: "Having thus ascertained the total sum, its payment must be anticipated and capitalized, and *the present worth obtained.*" (See 40 South. 290, for table.)

Burch lost his left leg a couple of inches above the knee and three toes off the right foot. He uses an artificial limb and is able in this way to walk and to work. There is no serious impairment of his general health or general physical capacity. As the court saw him he was in good physical condition. It is a matter of impaired locomotion upon his artificial leg as compared with his former capacity for movement.

In *Brown* v. *S. P. Co.*, 7 Utah, 288, plaintiff, a brakeman, had one of his hands cut off "and also other bodily injuries." The jury returned a verdict of $12,000. On motion for new trial the court reduced the judgment to $10,000. On appeal

the supreme court said, at page 293: "We think the damages awarded by the jury grossly excessive, and, even as reduced by the court, the amount of plaintiff's recovery is greatly in excess of what he is justly entitled to.  The plaintiff testified that he was confined to the house about two and a half or three weeks, most of the time in bed, on account of his injuries, and that it was about a month before he could go out on the street, and that, after getting out on the street, cold bothered his arm some; that he suffered pain longer with his left leg than with his arm; that it was about three weeks before his leg healed up.  He further testified that he had been employed as a brakeman about two and a half months; that before he began work as a brakeman he worked at home for his father on a farm; that he was in good health before he was injured, and earned his living by physical labor, and was not educated for any profession.  He also testified that since he recovered from his injuries his health had been good, and that he now is a strong, healthy man; that he works for his father on the farm, but that about all he does is to do chores and work in the garden.  He also testified that at the time he received the injuries complained of he was receiving from the railroad $70 per month, and something additional for extra time, making his wages at that time amount to $75 or $80 per month.  A railway company is entitled to have its rights and liabilities determined by the same rules of law and justice that apply in suits between individuals.  For an injury similar to the one complained of in this case, if inflicted by an individual, no jury would find such a verdict as was returned in this case. It is not claimed that the injury was wanton or wilful, and there was therefore no room for vindictive damages.  The injury to the plaintiff was merely an accident, resulting, it is true, as found by the jury, from the carelessness of the defendant company, but still an accident, in the sense that it was not intentional.  While the injury to plaintiff is severe, it only partially disables him, and there are many occupations in which he will be able to earn nearly, if not quite, as much as he usually earned before the accident.  By the verdict, as rendered, the plaintiff was given a nice little fortune, more than the majority of men earn in a lifetime, and vastly more

than the majority of men accumulate by a life of toil and privation. The annual income he would derive from the amount of the verdict, at the ordinary rate of interest, would be about one-fourth more than he was getting when he was injured, and the interest on the judgment, as finally modified, would exceed the highest wages he testified to ever having earned before the accident. There can be no reasonable doubt that the heavy damages awarded by the jury in this case were given under the influence of passion and prejudice, and, if passion or prejudice swayed the minds of the jury in awarding damages, the same or other improper influences may have operated upon their minds in determining the questions of fact necessary to fix the liability of the defendant. Doubtless the twelve men who composed the jury were, individually, honest men, but we are forced to the conclusion that they did not properly appreciate their duties and responsibilities as jurors in this case. The popular prejudice against railway corporations may not be wholly undeserved, but it should not be permitted to find expression in unjust verdicts. When the prejudice against these corporations becomes so strong as to taint the administration of justice, it becomes the duty of the courts to interfere. However reluctant to disturb the verdict of a jury for such a cause, we think the verdict in this case so excessive that it ought not to stand. While we consider it our duty to hold railway companies to a strict accountability for damages caused by their negligent or wrongful acts, yet we also feel it our duty to not permit a glaring injustice to be done them to satiate the demands of popular prejudice. The judgment must be reversed, and the cause remanded."

In *Needles* v. *C. & N. W. Ry. Co.*, 74 Wis. 239, a young boy sustained injuries necessitating amputation of both legs. The jury gave him a verdict of $30,000. The supreme court said: "The motion to set aside the verdict and grant a new trial was based in part upon the ground that the damages awarded were excessive. Of course there is a sense in which the damages awarded cannot be regarded as excessive. In this sense the learned counsel for the plaintiff is undoubtedly right in saying that, 'though this supreme court room were filled with gold there is no rational human being in the State of Wiscon-

sin who would change places with this boy, maimed as he has been by the negligence of the defendant, and accept the gold as compensation.' Yet no one would for a moment contend that such is the legal measure of damages, even in a case like this. Courts and juries must deal with such questions in a deliberate and practical sense. Without going into any discussion of the subject, we are constrained to believe that from some misconception of duty, misdirection of the court, passion or prejudice, the jury awarded damages considerably in excess of what the plaintiff was entitled to recover in any event. It follows that the motion to set aside the verdict and grant a new trial should have been granted upon this ground."

The following are also a few of the many cases that could be cited in which damages were held to be excessive by the appellate court:

*Kennon* v. *Gilnor*, 5 Mont. 257 (loss of foot, $20,500).

*Pfeffer* v. *Buffalo Ry. Co.*, 4 N. Y. Misc. Rep. 465 (loss of foot, $20,000).

*Barley* v. *Rome Ry. Co.*, 80 Hun, 4 (loss of leg, $16,000).

*Tully* v. *N. Y. Steamship Co.*, 10 N. Y. App. Div. 463 ($25,000 for loss of leg).

*Peri* v. *N. Y. Central Ry. Co.*, 87 Hun, 499 ($10,000 for loss of foot).

*Melse* v. *Alaska Commercial Co.* (Wash.), 84 Pac. 1127 ($20,000 for loss of leg and other injuries).

*Reynolds* v. *St. Louis Trans. Co.* (Mo.), 88 S. W. 50 ($23,400 for injury resulting in diabetes and paralysis of both legs).

*Rucker* v. *Central Ry. Co.* (N. J. L.), 61 Atl. 89 ($20,000 to locomotive fireman aged 38 earning $85 per month, for loss of leg and other injuries, reduced to $10,000).

*Newcombs* v. *N. Y. Central* (Mo.), 81 S. W. 1069 ($20,000, reduced to $10,000, where man 62 years old had leg amputated).

*Chicago Ry. Co.* v. *Jackson* (Ill.), 8 Am. Rep. 661 ($18,000 damages for loss of both legs by brakeman held excessive).

Where it clearly appears, as it does here, that the jury were influenced by passion or prejudice, the wrong done is not redressed by a partial remission of the verdict, and the moving party is entitled to have the entire verdict set aside and a new trial granted. (*Southern Pacific Co.* v. *Tomlinson*, 163 U. S.

369; *Adcock* v. *Ry. Co.*, 77 Pac. 78; *Unterberger* v. *Sharff*, 51 Mo. App. 102, 109.)

Defendant respectfully submits that this verdict is so excessive and is so much more than would have been given by the same jury in an action between private individuals, and discloses that undoubtedly the same prejudice, passion, bias, sympathy for plaintiff, or whatever you may choose to call it, that prompted this verdict, so impregnated the case and clouded the judgment of the jurors on the issues in dispute, that it would be wrong to foreclose the defendant by their findings on the question of fact. As was said in *Olson* v. *Northern Pacific Railway Company*, 81 Pac. 152: "We might follow our usual practice and reduce the judgment to such sum as the respondent is entitled to recover in our view of the facts, and require him to accept that amount or submit to a new trial; but the right of recovery is doubtful at best, and the verdict discloses such passion and prejudice on the part of the jury that it would be unjust to hold a litigant foreclosed by any of the findings. The judgment is therefore reversed, and the cause remanded for a new trial."

III. The court erred in permitting plaintiff's counsel to refer, in his argument before the jury, to the fact that defendant had secured a removal of the case to the United States Circuit Court.

In *Tucker* v. *Henniker*, 41 N. H. 325, Fowler, J., delivering the opinion of the court, said: "When counsel are permitted to state facts in argument, and to comment upon them, the usage of courts regulating trials is departed from, the laws of evidence are violated, and the full benefit of·trial by jury is denied. It may be said, in answer to these views, that the statements of counsel are not evidence; that the court is bound so to instruct the jury, and that they are sworn to render their verdict only according to evidence. All this is true, yet the necessary effect is to bring the statements of counsel to bear upon the verdict with more or less force, according to circumstances; and if they, in the slightest degree, influence the finding, the law is violated, and the purity and impartiality of the trial tarnished and weakened. If not evidence, then manifestly the jury have nothing to do with them, and the advo-

cate has no right to make them.   It is unreasonable to believe
the jury will entirely disregard them; they may think they
have done so, and still be led involuntarily to shape their ver-
dict under their influence.   That influence will be greater or
less, according to the character of the counsel, his skill and
adroitness in argument, and the force and naturalness with
which he is able to connect the facts he states with the evi-
dence and circumstances of the case.   To an extent not defi-
nable, yet to a dangerous extent, they unavoidably operate as
evidence which must more or less influence the minds of the
jury, not given under oath, without cross-examination, and
irrespective of all those precautionary rules by which compe-
tency and pertinency are tested."

(a) Comment by Mr. MacMillan, in his address to the jury,
on the fact that the defendant had removed the case to the
federal court—"Why did he remove it from here to the fed-
eral court of the United States, where the jurors of this town,
in which the witnesses lived, would not be called upon to pass
upon their credibility?"—was error.

1st.   In *Perkins* v. *Burley*, 64 N. H. 524, counsel for the
prevailing party, in his closing argument, said to the jury,
that if they knew how the plaintiff and his father and brother
(who were witnesses for him) were regarded in the vicinity
in which they lived, he would be willing to submit the case
without argument.   This was held to be sufficient ground for
setting aside the verdict.

2d.   Fact that change of venue had been had must not be
commented upon by counsel in argument to the jury.   And
if such comment be made, and not checked by the court, or
if it be persisted in after being reproved by the court, it will
be sufficient ground for reversing the judgment.   (*Paulman* v.
*Clay Comb*, 75 Ind. 64; *Campbell* v. *Maher*, 105 Ind. 383; *Wor-
ley* v. *Moore*, 97 Ind. 15; *Devries* v. *Phillips*, 63 N. C. 53; *State*
v. *Smith*, 75 N. C. 306.)

In the case last cited, the prosecuting attorney said: "The
defendant was such a scoundrel that he was compelled to
move his trial from Jones County to a county where he was
not known."   This was held to be highly improper.

In *State* v. *Phillips*, 24 Mo. 483, a new trial was granted

because the state's attorney read the proceeding on an application for change of venue, which was granted.

3d.    The defendant company conceived that it had a right to remove the case to the federal court, and Judge Hawley agreed, as will be seen by reference to his opinion in 139 Fed. 350, and its excuse of that right could not be commented on to its disadvantage and prejudice.

And the United States Supreme Court has, since the ruling on the Burch case (152 Fed. 168), held that the defendant could have rightfully continued on in the federal court had not plaintiff made a motion to remand. (*Western L. & S. Co.* v. *Butte & B. C. M. Co.*, June 1, 1908.)

Corson, J., in *Lindsay* v. *Pettigrew*, 52 N. W. 873-4, said: "While great freedom should be allowed to attorneys in the argument of their cases before a jury, such arguments should be confined to the facts admitted in evidence, criticism and discussion of the same, and of the proper and legitimate inferences to be drawn therefrom. If counsel can be permitted to make assertions of facts not supported by the evidence, there is great danger that the jury will lose sight of the issues in the case, and be improperly influenced by such statements, to the prejudice of the adverse party. Within the limits of the testimony, the right of argument, criticism, and comment is free; but when counsel makes assertions calculated to prejudice the minds of the jury, not warranted by the testimony before them, he goes beyond the freedom of discussion the law and the courts allow him. The only matters proper to be considered by the jury are the issues raised by the pleadings and the evidence admitted by the court. The length of time a cause has been pending in the court, *the proceedings had to obtain a change of venue,* or *had under such change or otherwise,* and the fact of other litigation between the parties and the result of the same, are not matters with which the jury have any concern. To bring such matters, therefore, to the attention of the jury for the purpose of creating in their minds a prejudice against a party and influencing their verdict, is to transcend the freedom allowed counsel in the proper presentation of their cause to the jury. * * * Such statements were well calculated to prejudice the jury against the defend-

ant, and influence their verdict. ' * * * The learned counsel for the plaintiff, evidently in his zeal for his client, in these various statements overlooked those great principles of professional ethics that should govern and control counsel in the argument of their causes before a jury. Counsel, as officers of the court, should never, in their zeal for their clients, so far forget the duty they owe to the court as to improperly attempt to prejudice or influence the jury in the discharge of their duties by bringing before them in argument matters not in evidence in the case; and it is the duty of trial courts to see that no such improper statements are permitted to be made to the jury."

(b) The court could not by instructions, admonition or rebuke entirely destroy the sinister influence of counsel's remarks. Accordingly, it is held that, since it is the duty of the court, upon its own motion, to keep arguments to the jury within legitimate limits, it is the duty of the trial judge, if he believes any improper elements have been worked into the case by improper and prejudicial appeals to the jury, to award a new trial if for such prejudicial matter one be asked—and this too even though no objection was made to such matter during the trial. (North Chicago St. Ry. Co. v. Leonard, 67 Ill. App. 603; Brown v. Swineford, 44 Wis. 292.)

It is well settled that the presiding judge should, either by his own motion, or upon request of counsel, check counsel in an improper line of argument. (Berry v. State, 10 Ga. 511; Forsyth v. Cothran, 61 Ga. 278; Willis v. McNeil, 57 Tex. 474; Gulf Ry. Co. v. Butcher, 83 Tex. 309; Brown v. Swineford, 28 Am. Rep. 587; Earll v. People, 99 Ill. 123; Little Rock Ry. Co. v. Cavenesse, 48 Ark. 106; Hoxie v. Home Inv. Co., 33 Conn. 471; Killins v. State, 28 Fla. 313; Rushfield v. Waldron, 83 Mich. 116; Goodman v. Evans, 134 Ind. 46; Mehagun v. McManus, 35 Neb. 633.)

The excuse given by plaintiff's counsel that his argument was in reply to Mr. Shoup, who had said that defendant was not afraid to submit its case to jurors of this town in which the witnesses lived, was not a valid justification for counsel's argument. Even an improper argument by counsel on one side will not justify an improper argument in reply. Such a

rule would turn a court into a town meeting. (*Bennett* v.
*State*, 22 Am. St. Rep. 468.) But plaintiff's counsel knew,
as does every lawyer, that the reason why it would be to
defendant's advantage to remove the case to the federal court
was because, in the latter court, the concurrence of twelve
jurors would be essential to a verdict, while in a state court
the concurrence of nine jurors would be all that would be
necessary. The residence of the witnesses did not have, and
could not have, any relevancy upon the question of removal,
so that the justification offered was no better founded in fact
than the right of counsel to comment on the removal was
founded in law; but the refusal of the court to prevent such
improper argument, and the fact that the prejudicial state-
ments thus made were in plaintiff's closing argument, to
which defendant had no reply, necessarily left in the minds
of the jury the impression sought to be created by plaintiff's
counsel that the right of removal was exercised by defendant
for the sole purpose of trying the case in a court where its
witnesses would not be known to the jury.

V. The court erred in permitting evidence to be introduced
showing that the yardmaster had authority to hire and dis-
charge employees.

In an effort to show that the yardmaster had authority to
bind the defendant by his promise to repair the alleged defect-
ive switch stand, plaintiff introduced in evidence, over the
objection of the defendant, testimony tending to show that the
yardmaster had authority to employ and discharge employees.

Q. Do you know of your own knowledge whether or not the
yardmaster hired and discharged employees?

Mr. Shoup—We object to the question, your honor, upon
the ground that the hiring and discharging of men does not
under any circumstances tend to show the vice-principalship
of the yardmaster; and upon the further ground that no proper
foundation for such evidence has been laid, in that the rules
of the company are the best evidence of the vice-principalship
of the yardmaster.

The Court—It tends to show the scope of the authority of
the yardmaster. I think it is admissible to show the scope of
his authority for that purpose.

Mr. Shoup—Note our exception upon the ground that the mere hiring and discharging of servants does not make a servant a vice-principal, except as respecting the discharging and hiring of and selecting competent and careful servants.

And in support of such assignment of error, defendant specified the grounds of objection and exception as set forth in the foregoing statement on motion for new trial, reference being hereby further made to the said transcript of the testimony.

The general rule is that the mere power to hire and discharge employees does not make a servant a vice-principal. (*Stevens* v. *S. F. Ry. Co.*, 100 Cal. 554; *Lincoln Co. N. Co.* v. *McNally*, 15 Ill. App. 181; *Hamilton* v. *Iron Mountain Co.*, 4 Mo. App. 565; *Union Pacific Ry. Co.* v. *Doyle*, 50 Neb. 555; *Gilnor* v. *Oxford Iron Co.*, 55 N. J. L. 39; *Vogle* v. *American Bridge Co.*, 180 N. Y. 373; *Webb* v. *Richmond Ry. Co.*, 97 N. C. 387; *Casey* v. *Penn. Paving Co.*, 198 Pa. St. 348; *Hanna* v. *Granger*, 18 R. I. 507; *Alaska Treadwell N. Co.* v. *Wheelan*, 168 U. S. 86.)

It is of course conceded that where the alleged breach of duty was the employment or retention of unfit servants, the evidential significance of a power to hire and discharge subordinates is considered from a standpoint quite different from that which is appropriate where the general agency of a delinquent employee is in question (Labatt, Master and Servant, vol. 2, p. 1436), but, as already stated, there is no issue in this case as to the employment or retention of unfit servants.

It is apparent from the uncontradicted testimony in this case that the yardmaster was simply a "mere foreman to oversee a batch of hands, direct their work under the supervision of the master, see that they perform their duty, and, in case of dereliction, report them." This does not, however, constitute a vice-principal who must have general power and control over the business and not mere authority over a certain class of work or a certain gang of men. (Labatt, sec. 519.)

VI.    The court erred in refusing to give defendant's Instruction No. 4 to the effect that if the jury believed from the evidence that plaintiff attempted to board the caboose contrary to the rules of the company, and plaintiff knew of that rule, the jury should find for the defendant.

The court erred in refusing to give defendant's request for Instruction No. 4, for the reason that said instruction correctly states the law, and the defendant excepts to the modification of said instruction as stated in the court's instruction substituted for defendant's Instruction No. 4, in that said instruction authorizes the jury to find that the said rule in question was not generally observed by the switchmen and employees of the defendant corporation, whereas the rule of law is that where an act is dangerous in its character, it cannot be justified by the fact that the act itself was generally practiced by employees, or that the rule was customarily violated. The defendant further excepts to the said modification of said instruction upon the ground that it requires the defendant to establish not only the existence of the rule itself to the knowledge of the plaintiff, but also that said rule was not only generally observed, but was generally enforced by the officers in authority for said corporation. The said defendant further excepts to the instruction substituted for defendant's Instruction No. 4 in that it eliminates from the jury's consideration the question of whether or not the defendant had knowledge that said rule was not generally obeyed by its employees. The defendant further excepts to the said instruction as substituted for defendant's Instruction No. 4 in that it takes from the consideration of the jury the fact that plaintiff knew of the existence of said rule referred to in said instruction. The defendant further excepts to said substituted instruction upon the ground, first, that it reverses the order of proof with reference to the enforcement or knowledge of said rule, and, second, that it does not correctly state the law with reference thereto.

The following is defendant's Instruction No. 4 as requested by defendant: "If you believe that the plaintiff attempted to jump onto the forward end of the caboose coming towards him while going at a rapid speed, and that the same was forbidden by the rules of the company, and that plaintiff knew of that rule, then you must find for the defendant."

The following is the instruction substituted by the court for defendant's Instruction No. 4 and given to the jury: "If you

believe that the defendant attempted to jump on the forward steps of the caboose coming towards him, while going at a speed of about eight miles an hour, and that such act was forbidden by the rules of the company, because of its being too high a rate of speed to allow a switchman to board an approaching caboose, and that plaintiff knew, or working in the capacity of a switchman it was his duty to know, of that rule, and you also believe from a preponderance of the evidence that the said rule was .generally observed by the switchmen.employees of the defendant corporation, and was generally enforced by the officers in authority for said corporation, then you should find for the defendant.

"Given.                    (Sgd.) W. H. A. PIKE, *Judge*."

Although it does not appear that a servant has seen a rule, if it is accessible to him, and it is his duty to examine it, he must be charged with knowledge of its existence. (*O'Malley* v. *New York R. Co.*, 67 Hun, 133, 22 N. Y. 48. See, also, *Dobson* v. *United Collieries*, 8 F. 241; *Alabama G. S. R. Co.* v. *Carroll*, 84 Fed. 772; 52 U. S. App. 442; 28 C. C. A. 207.)

Knowledge of rules by a servant may, it seems, be presumed under certain states of facts and circumstances from the length of service of the person to be charged. (*Francis* v. *Kansas City R. Co.*, 110 Mo. 397; 19 S. W. 935.) Thus, where one has been in the employ of a railroad company as a section hand for many months, the presumption is that he is acquainted with a rule for the regulation of his conduct. (*Shenandoah Valley R. Co.* v. *Lucaso*, 86 Va. 390, 10 S. E. 422.) And where a person has been employed as a car inspector for several years he is chargeable, it seems, with knowledge of rules respecting the repair of cars. (*Canadian Pac. R. Co.* v. *Elliott*, 137 Fed. 904, 70 C. C. A. 242.)

If a servant relies upon the abrogation of a rule by its habitual disregard it devolves upon him to establish that fact. (*Galveston R. Co.* v. *Gormley*, 91 Tex. 393, 43 S. W. 877; *Illinois Cent. R. Co.* v. *Zerwick*, 88 Ill. App. 651.)

The question whether the rules of a master have been nullified by their habitual disregard is a question for the jury. (*Tullis* v. *Lake Erie R. Co.*, 105 Fed. 554; *McNee* v. *Coburn*

*Trolley Track Co.*, 170 Mass. 285, 49 N. E. 437; *Denver R. Co.* v. *Smock*, 23 Colo. 456, 48 Pac. 681; *Mohr* v. *Lehigh Valley R. Co.*, 55 N. Y. App. Div. 176, 66 N. Y. Supp. 899.)

Nowhere in the charge of the court was the jury told that if Burch hit the switch stand after he had fallen from the steps by reason of missing his handhold or foot, the company would not be liable. The court struck out of our requested instruction all reference to the switch stand and left the jury to infer, and they probably did so decide, that just so long as he hit the switch stand, even after falling, that made out his case.

Counsel for plaintiff endeavored to argue that the general charge of the court covered this issue so that the jury could not have been misled, but they could not point out any instruction wherein the attention of the jury had been called to this controlling point in the case, and the court will see, by reviewing the instructions, that the jury were not given any clear understanding of this company's defense. A general instruction of the court may give a correct abstract proposition of law, but here we respectfully submit that we were entitled to have our instruction go to the jury as a guide as to what the law was conforming to the facts in evidence and defense urged by us. It is the duty of the court, when requested, to lay down the law to the jury touching every hypothesis of fact presented by the evidence. The first duty is to make the jury comprehend what is the question or fact in dispute between the parties. The jury go wrong oftener from not understanding the true issue than from any wish to wrong or do wrong in finding a verdict. And courts often fail in conveying to the minds of a jury the exact facts in dispute, or the issue between the parties, through the fear of exceeding the proper limits of a trial judge. In doing this the judge need express no opinion as to what the truth is on the evidence; he can still leave this to the unbiased action of the minds of a jury. But the court should never omit to charge on that first right of a party—that of making the jury see the exact and naked point in dispute, and in leaving that dispute to be settled by the yea or nay of the jury. Unless a charge succeeds in doing this, it has done very little, if any, good.

VIII. The evidence is insufficient to justify the verdict,

and the verdict is against law. The defendant moved the court for a new trial in this case upon the grounds: First, insufficiency of evidence to justify the verdict; second, the verdict is against law. The Statutes of 1907, p. 360, provide that: "In such case, where it appears that the evidence taken all together does not support the verdict, or decision, or judgment, or decree of the court, a new trial shall be granted, or, upon appeal, the case shall be reversed without regard to whether there are express findings upon all the issues, or whether the specifications particularly point out the finding or findings, either express or implied, that are not supported by the evidence or are contrary thereto."

Whether incited to it by the inflammatory statements of counsel, or blinded by their sympathy for plaintiff in his unfortunate condition, or, as would appear from the grossly excessive verdict, acting under the influence of prejudice and passion, the fact remains that the jury absolutely disregarded the facts and merits of the case.

Taking this case by its four corners, we find that the whole case rests upon the alleged complaints of Burch to Kitto and Fridley and their alleged promises to repair, but the testimony of Burch himself, and of his witness, Burney, and the record of the company introduced in evidence, absolutely negative the correctness of his story.

While the appellate courts have said many times that they would not disturb the verdict or finding of a trial court upon disputed questions of fact, the appellate courts have also recognized that the contradiction and inconsistency in the testimony of witnesses are more apt to be visible to the appellate court than to the trial court, as the appellate court has the advantage of more deliberate consideration. (*Davidson* v. *Ross*, 24 Grant Ch. U. S. 22, 50; *Faulkner* v. *Simms*, 94 N. W. 113; *Bordeaux* v. *Bordeaux*, 80 Pac. 6; *The Columbian*, 100 Fed. 991.)

The well-known tendency of juries, in controversies between individuals and corporations, to disregard the facts has received judicial recognition. (*Herring* v. *N. Y. Ry. Co.*, 13 Bar. 9; *Wright* v. *Southern Express Co.*, 80 Fed. 85; *Collins* v. *Albany Ry. Co.*, 12 Bar. 402; *Underhill* v. *N. Y. Ry. Co.*, 21 Bar. 489;

*Cookson* v. *Pittsburg*, 179 Pa. St. 184; *Lewis* v. *Long Island Ry. Co.*, 65 N. Y. Supp. 595.)

IX.   The evidence shows that any risk arising by reason of the switch stand was assumed by plaintiff.

Switches near track are within ordinary risks assumed. (*Dacey* v. *N. Y. & C. R. Co.*, 168 Mass. 479; *Bell* v. *N. Y. & C. R. Co.*, 168 Mass. 447.)

Where a fence about four feet from track was a permanent visible structure, a brakeman was held to take the chance of running against it in descending from a passing car. (*Ryan* v. *Ry.*, 169 Mass. 267.)

Where an employee continued in service of company two years after platform was built between tracks in such manner as to leave only a few inches between it and a passing car, he knew, or might have known with ordinary care, of defect, he assumes risk. (*Pingo* v. *Ry. Co.*, 52 Iowa, 276.)

X.   The court erred in denying defendant's motion for a judgment of nonsuit.

At the close of plaintiff's case, the defendant moved the court for a nonsuit.   One of the grounds for the nonsuit was that the evidence showed that whatever injury plaintiff sustained while attempting to board or in boarding any of defendant's cabooses was caused by his own negligence and fault, and that his own negligence and fault was contributory to the accident and said injuries, and that the proximate cause of plaintiff's injuries was the result of his own negligence and lack of proper care.   The motion was denied, to which defendant excepted upon the grounds: First, the evidence failed to show that plaintiff had notified the proper officials of the defendant of any defect in the switch stand, and that therefore he assumed the risk arising therefrom; second, that the evidence shows, without conflict, that plaintiff was guilty of contributory negligence in attempting to board the moving caboose at the time, and in the place, and in the manner that he did.

In the case at bar the plaintiff on cross-examination testified that, although he knew about the dangerous condition of the switch and had passed it a number of times the day of the accident, he attempted to board a moving car from a

position but a few feet away from the dangerous switch in a situation where the forward movement of the car was such as to inevitably bring him into contact with the switch. He sought to excuse this rash act upon the ground that at the moment of boarding the car he had forgotten about the switch. It must be remembered that, according to his own testimony, he had no duties to perform at that time. No act upon his part was necessary, except the simple act of boarding the car, an act which had been performed by him so many times that it must necessarily have become purely mechanical. Yet he says he forgot about the switch stand although he must have almost brushed against it before he stopped to wait for the approaching car. Conceding, however, that his testimony as to his forgetfulness is true, and that his act of boarding the car as he did was not due to the willingness on his part to take a chance, the mere fact that he forgot the danger will not relieve him.

In Labatt on Master and Servant, sec. 281, it is said: "Temporary forgetfulness of a known danger at the time of the accident: It would clearly be inconsistent with the rationale of the defense of assumption of risks to regard it as being applicable in cases where, through mere inadvertence at the time of the accident, the servant failed to recollect or to observe the existence of a risk previously known to and appreciated by him. Accordingly, forgetfulness of and inattention to such a risk, when they are not brought about by any cause which the average man would consider adequate to justify the mental status thus designated, are universally regarded as insufficient reasons for excluding defense. A lapse of memory or the inaction of the faculties of observation, under such circumstances, may fairly be regarded as a conclusive proof of negligence, the result being that the servant is incapacitated from recovering, either on that ground or on the ground that he was constructively chargeable with a knowledge of the risk during the fatal period of forgetfulness or inattention, and that his responsibility for such injuries as might result from that risk was continuous and uninterrupted."

The court has passed directly on the question. The act of March 2, 1893, providing that any employee of any interstate

carrier who may be injured by any car used in interstate traffic by reason of the same not having been equipped with an automatic coupler device, coupling by impact, shall not be deemed to have assumed the risk thereby occasioned, though continuing in the employment of the carrier after the unlawful use of the car has been brought to his knowledge, did not relieve an employee injured by a car not so equipped from liability for his own contributory negligence.

"Plaintiff, a skilled switchman, was injured while attempting to couple two cars equipped with link-and-pin couplers, with which he was perfectly familiar. The engineer was under his directions at the time, and backed the train so slowly that it hardly moved. Plaintiff took hold of the link of the approaching car with his left hand to guide it, and, having done so, left his hand between the drawheads until his fingers were crushed by the impact. *Held*, that under the particular facts appearing in the case the plaintiff was guilty of contributory negligence as a matter of law.

"It cannot be assumed that by the passage of the salutary law, designed for the protection of those engaged in a hazardous occupation, Congress intended to offer a premium for carelessness or to grant immunity from the consequence of negligence. The reasonable conclusion is that the defense of contributory negligence is as available to a railroad company after as before the passage of the act of Congress, although it has not complied with its requirements." (*D. & R. G. R. Co. v. Arrighi*, 129 Fed. 347.)

XI. The court erred in submitting to the jury the question as to whether or not the plaintiff had complained to the proper person about the defective switch stand.

One of the grounds for a nonsuit was that the evidence was insufficient to show that the plaintiff complained to the defendant of any defective switch or switch stand, or that defendant promised or agreed to repair the same.

Plaintiff relied upon the alleged promise of the yardmaster and station agent and trainmaster to repair the defect. Conceding for the sake of argument that the evidence is sufficient to show that both Mr. Fridley, the yardmaster, and Mr. Kitto, the station agent and trainmaster, had authority to order the

defective switch stand repaired, it does not follow from the evidence that they, or either of them, were the proper persons to whom complaint should be made, or whose promise to repair was binding upon the company. The evidence introduced by the plaintiff himself affirmatively established the fact that the person in the employ of the company who should have been notified by plaintiff of this defective switch stand was the section foreman at Winnemucca and the superintendent at Ogden.

Rule 309 is as follows: "Yardmen, trainmen and other employees are directed to report to the superintendent any defects in the construction of the yard tracks whereby accident might happen to men in the discharge of their duties."

Rule 334 is as follows: "It is the duty of every employee, regardless of department, to report defects in road or bridges, or obstructions of any kind, to the superintendent, and, if possible, to the nearest section foreman."

These rules were introduced in evidence by plaintiff and they constitute a part of plaintiff's case.

In passing upon this part of the motion for a nonsuit, after ruling that the question as to whether or not the yardmaster and the station agent were proper parties to notify should be submitted to the jury, the trial court said: "It is very evident, from the testimony so far had in this case, that there was only one other party around the Winnemucca yards or establishment that he could properly report to, and that would have been the section foreman, and he said he did not report to the section foreman, and as to why he did not is a matter of mere conjecture."

Plaintiff did not testify, nor claim, that he was not familiar with these rules. Instead of notifying the section foreman, who was directly responsible for the safe condition of the switch stand, he notified the yardmaster, who was not responsible for such defect, and the station agent, who was not responsible either. As neither the yardmaster nor the station agent was responsible, the matter did not impress itself upon their attention as it would have impressed itself upon the section foreman, with the result, if plaintiff's testimony be true, that the promises given by the yardmaster and station

agent were forgotten; and this, in turn, brought about the accident which would have been prevented had the rules of the company been complied with.

It is respectfully submitted that the judgment and the order denying defendant's motion for a new trial should be reversed.

*H. H. Henderson* and *H. R. MacMillan*, for Respondent.

By the Court, SWEENEY, J.:

This is an action instituted March 24, 1905, in the District Court of the Fifth Judicial District, in and for the County of Humboldt, for the recovery of $26,700 damages for personal injuries sustained by plaintiff while in the employ of the defendant in its railroad yards at Winnemucca, Nevada, as a yard switchman, on October 26, 1903, at which time plaintiff sustained injuries necessitating the amputation of his left leg three inches above the knee and three toes of his right foot. The trial of the cause before a jury at Winnemucca on December 23, 1907, resulted in a verdict for the plaintiff for $20,000 damages. A motion for a new trial was demanded and denied, and from the order denying the motion for a new trial defendant appeals on many grounds, which we will hereinafter consider.

Plaintiff contends that, while attempting to board the front end of a caboose backing toward him, he was struck by a defective switch stand, and knocked from the step of the caboose under the wheels. The defendant denies that plaintiff was knocked off the caboose by coming in contact with the switch stand, and contends that he did not hit the switch stand until after falling from the caboose, which he attempted to board, thereby relieving the defendant of any responsibility, by reason of the accident being caused by the plaintiff's fault and negligence.

In order to maintain this action plaintiff alleged, first, that he was in the employ of the defendant as a switchman in its Winnemucca railroad yards; second, that he was injured in the course of his employment by a defective switch stand in the yard; third, that the defendant was notified of, and had promised to repair, the defect in the switch stand; fourth,

that plaintiff, relying on the promise of the defendant to repair the defective switch stand, continued in the employ of the defendant; fifth, that the defendant did not keep its promise to repair; and sixth, that the defect in the switch stand was the proximate cause of his injuries. The defendant admitted that plaintiff was in its employ as a yard switchman at the time of the accident, but denied that he was injured by a defective switch stand, or that there was any defective switch stand in its yards; denied any promise to repair; denied that plaintiff had suffered any injuries due to the negligence of the defendant; alleged that the rules of the company required all employees to report to the superintendent any defect in the construction of the yard tracks whereby any accident might happen to the employees, and further alleged that the proximate cause of the plaintiff's injuries was his failure to secure a firm handhold on the caboose while the caboose was in motion, and thereby lost his balance, was thrown under, and run over by, the wheels of the caboose. The issues being thus made, the parties went to trial, and after a warmly contested suit upon many interesting and important points of law and fact, raised and ably pressed and resisted by counsel on both sides, and a mass of conflicting testimony for and against the issues as contended for, the jury arrived at a verdict in favor of the plaintiff.

As to the important issues of fact submitted to the jury on which the liability of the defendant was established, this court, after a careful examination of the testimony adduced, is of the opinion that there is sufficient substantial evidence in the record to support the verdict of the jury, and, in harmony with the well-settled rule established in this court in the recent case of *Murphy* v. *Southern Pacific Company*, 31 Nev. 120, and many other cases, that where there is a substantial conflict of testimony upon any material issue, the verdict will not be set aside, we prefer to follow, rather than to establish, a new rule. The evidence touching on the material and vital points involved we will consider later, and during the course of the opinion, and will proceed to consider and pass upon the errors assigned and relied on by counsel for the defendant in the order in which they have presented them.

1.    Appellant assigns as its first error that the court erred in denying the challenge of defendant to Juror Nofsinger, upon the ground that the examination disclosed a frame of mind wherein the juror said that the crippled condition of the plaintiff created in his mind a feeling that would cause him to lean towards the plaintiff and against the defendant. This challenge was made under subdivision 7 of section 164 of our civil practice act (Comp. Laws, 3259).    That section provides: "Challenges for cause may be taken on one or more of the following grounds:    *    *    *    (7) The existence of a state of mind in the juror evincing enmity against or bias to or against either party."

In the light of this ground for challenge, let us examine the testimony of Juror Nofsinger on his *voir dire*, and see if he so disqualified himself as to bring himself within the pale of a disqualified juror:

Q.  Have you reached any opinion that concerns the merits of the case that would take evidence to remove it?    A.  No, sir.

Q.  You are entirely unbiased and unprejudiced?    A.  Yes, sir.

Q.  Are you acquainted with Mr. Burch?    A.  I am not.

Q.  Well, are you acquainted with Mr. Burney?    A.  Whom?

Q.  Mr. Burney?    A.  No, sir.

Q.  Are you acquainted with Mr. Kitto?    A.  Yes, sir.  *  *  *

Q.  Do you know of any reason why you should not sit on this jury?    A.  No, sir; I do not know of any.    *    *    *

Q.  You know the defendant is a corporation?    A.  Yes, sir.

Q.  Have you any prejudice at all against corporations in general?    A.  No, sir.

Q.  Have you any prejudice or feeling against the Southern Pacific, this defendant, for any cause?    A.  No, sir.

Q.  If taken as a juror, would the Southern Pacific stand equally as well with you as the plaintiff, who is an individual? A.  I think so.

Q.  Then you are conscious of no 'feeling or prejudice that would cause you to lean against the defendant if taken as a juror?    A.  No, sir.

Q.  Would the fact that the plaintiff to this action lost his leg, and his foot was injured, create any sympathy in your

mind that would lead you to lean towards him and against the company at the trial of this case? A. It might.

Q. It might? A. Yes, sir.

Q. You naturally have sympathy for a man in this condition? A. Yes, sir.

Q. And you feel that that sympathy would influence your mind in case you were taken as a juror? A. Well, I don't think it would.

Q. You don't think it would? A. No, sir.

Q. Of course we would like to know. A. It would.

Q. What say? A. It would.

Q. It would? A. Yes, sir.

Q. You could not then entirely disabuse your mind of that fact? A. No, sir.

Q. You would go into that box with a feeling of sympathy and friendliness towards the plaintiff owing to his condition that would influence your mind in making up your verdict, if you were taken as a juror? A. Yes, sir.

Q. Are you firmly convinced of that, that you are settled in your opinion? A. Well, no, sir; I am not. I could not say that I am firmly convinced, but I believe it would.

Q. Still you have in your mind that feeling now? A. Yes, sir.

Q. Strong enough, is it, you are as to that impression? A. Yes, sir.

Q. That your sympathy for his condition would influence you in this matter in case you are taken as a juror? A. Yes, sir; it would.

Q. Then I would take it, in a measure, and the way that is, that you would lean against the defendant owing to his unfortunate condition? A. I don't know as it would be exactly against the defendant; it perhaps would—yes, sir.

Q. It would be against the defendant and in favor of the plaintiff? A. Yes, sir.

Q. You feel conscious in that, do you? A. I do.

Judge Mack—We challenge the juror for cause under the seventh subdivision of the section we read yesterday.

Mr. Henderson—I would like to ask one question. Sup-

posing the evidence in this case would show that the plaintiff himself was negligent, and that the company was not to blame at all, would you say that that sympathy for the plaintiff would overdo what the evidence showed? A. I don't know whether it would or not.

Q. You think you would be guided entirely by the evidence? A. Yes, sir.

Q. And you could a true and just verdict render according to the evidence? A. Yes, sir.

Q. And if the evidence should be against the plaintiff, you could bring in a verdict for the defendant? A. Yes, sir.

Q. Now, if you were called as a juror in this case, would you put aside that feeling of sympathy, and try it upon the evidence, and the instructions of the court? A. I would.

Q. And render your verdict accordingly. A. Yes, sir.

Mr. Henderson—We deny the challenge.

The Court—The challenge is on the ground that there is a prejudice already existing?

Judge Mack—Prejudice towards one and in favor of the other.

The Court—(Q.) You think, Mr. Nofsinger, that the plaintiff in this case is considerably injured, and crippled for life; do you think that would have any influence over you in rendering your verdict? A. I do not think it would.

The Court—Challenge denied.

A careful study of the questions propounded and answers given by the juror, which, it is alleged, disqualifies him, read in connection with the entire examination, which should always be done before passing upon the qualification of a juror, leads us to the conclusion that the juror was not disqualified. It is apparent to us that what the juror was trying to express, as indicated by his answers, as influencing the mind of the juror toward a verdict in favor of the plaintiff, was that he entertained a feeling of brotherly sympathy toward the plaintiff because of his misfortune, which is not at all unnatural, and, in fact, would be unnatural if otherwise, but that, notwithstanding this sympathy which he entertained for the plaintiff, he could put aside any such feeling of sympathy, and try the case upon the evidence and the

instructions of the court.   The examination discloses to our mind that he did not thoroughly comprehend the answers he was making to defendant's counsel, which they assert disqualifies him, and this is evidenced by his answers to both counsel for the defendant and plaintiff, and the court, after he thoroughly comprehended what was legally required of him in the discharge of his duty as a juror.   No place in the examination of this juror did he testify that he could not do his duty in a fair and impartial manner toward both the plaintiff and defendant, but repeatedly stated that, if accepted as a juror, if the evidence warranted a verdict against the plaintiff, he would bring in a verdict for the defendant; would put aside any feeling of sympathy he entertained for the plaintiff, and render a true and just verdict according to the evidence and under the instructions of the court.

The Supreme Court of California, in the case of *Fitts* v. *Southern Pacific Co.*, which was an action against the railroad company for damages for injuries sustained, in commenting upon the qualification of a juror who had long been in the employ of the railroad, but had ceased his employment, and who stated, in effect, that because of his past association with the railroad he knew that many of this character of cases against the railroad were caused through the carelessness of the employees themselves, and therefore his sympathies were with the railroad, said: "It is true that a general abstract bias which a juror may entertain to a class of litigation will not of itself disqualify him from trying a cause, when it appears that, notwithstanding he entertains that feeling, he can set it aside, and can and will fairly and impartially decide the particular case solely upon the evidence and the instructions of the court." (149 Cal. 310, 86 Pac. 710, 117 Am. St. Rep. 130; *Baker* v. *Borello*, 136 Cal. 166, 68 Pac. 591; *Graybill* v. *De Young*, 146 Cal. 422, 80 Pac. 618.)   And, analogously to the reasoning of this rule laid down by the Supreme Court of California, we believe it is proper to state, as a correct rule in cases of this character, regarding the general abstract bias which a juror may entertain when he expresses a sympathy for the plaintiff because of his unfortunate condition by reason of an accident, but believes and positively states that he can set

aside any sympathy which he entertains toward plaintiff, and render a true and just verdict on the evidence at the trial and the instructions as given by the court, that a general expression of sympathy for a plaintiff in this class of cases, such as disclosed by the above examination, would not be sufficient to disqualify him as a juror under the exception proposed.

The Supreme Court of the United States, in the case of *Reynolds* v. *United States*, said: "The theory of the law is that a juror who has formed an opinion cannot be impartial. Every opinion which he may entertain need not necessarily have that effect. * * * It is clear, therefore, that upon the trial of the issue of fact raised by a challenge for such cause the court will practically be called upon to determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality. The question thus presented is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that character, upon the evidence. The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest." (98 U. S. 145, 25 L. Ed. 244.)

The Supreme Court of Nevada, in the case of *State* v. *Simas*, in considering a similar question to the one now under consideration, said: "The jurors being examined in the presence of the judge of the trial court, and subject to his observation and examination, and the judge in most instances being personally acquainted with the jurors, where there is not a dense population from which the jurors are summoned, his judgment as to the qualification of the jurors is entitled to great weight, and should not be overruled by the appellate court, unless it is clearly manifest that he has erred in his rulings upon the challenge interposed. It devolves upon the appellant to affirmatively and clearly show error." (25 Nev. 451.)

Viewed in the light of these opinions, we believe the trial court properly denied the challenge for cause to the juror Nofsinger. This juror, however, was later peremptorily excused from the jury, and was not one of the twelve jurors who tried this cause and unanimously agreed on this verdict. It is well settled by this and other courts that, even though

the court erred in denying a challenge for cause, if the complaining party peremptorily challenges the juror complained of, and he is excused, and the complaining party has peremptory challenges remaining, even if error were committed by the trial court in denying a challenge for cause, the peremptory challenging and excusing of the same juror cures the error committed, and would be deemed error without injury. (*Fleeson* v. *Savage M. Co.*, 3 Nev. 157; *State* v. *Raymond*, 11 Nev. 98; 1 Thompson on Trials, sec. 115; *State* v. *Hartley*, 22 Nev. 342.)

In the present case it is urged that the defendant was obliged to use one of its peremptory challenges on the juror complained of, thereby depriving it of the right to exercise its full quota of peremptory challenges upon objectionable jurors, and that there was one objectionable juror on the jury whom it would have peremptorily challenged had it not been obligated to exercise one of its peremptory challenges on Juror Nofsinger, and had no peremptory challenges remaining. We believe if the challenging for cause had not been properly denied by the court, that, under the circumstances in the present case, it would have been reversible error to have forced the defendant to use a peremptory challenge in getting the objectionable juror off the panel, thereby exhausting all of its peremptory challenges and depriving it of the substantial right to have used the challenge on any other juror who might have been objectionable to it. (*Hubbard* v. *Rutledge*, 57 Miss. 12, citing 3 Blackstone's Com. 363; 2 Graham & Watterman's New Trials, 245, *et seq.; State* v. *Fourchy*, 51 La. Ann. 228, 25 South. 109; *State* v. *Brown*, 15 Kan. 400; *People* v. *McQuade*, 110 N. Y. 284, 18 N. E. 156, 1 L. R. A. 273; *C., R. I. & P. Ry. Co.* v. *Downey*, 85 Ill. App. 179; *People* v. *Casey*, 96 N. Y. 123; *Ward* v. *State*, 102 Tenn. 734, 52 S. W. 996; *Dowdy* v. *Com.*, 9 Grat. 727, 60 Am. Dec. 322; *Fletcher* v. *Crist*, 139 Ind. 126, 38 N. E. 472; *State* v. *Rutten*, 13 Wash. 203, 43 Pac. 30; *Hartnett* v. *State*, 42 Ohio St. 568; *Thurman* v. *State*, 27 Neb. 628, 43 N.W. 404; *Miller* v. *State*, 29 Neb. 445, 45 N. W. 451; *Theisen* v. *Johns*, 72 Mich. 291, 40 N. W. 727; *Polk* v. *State*, 45 Ark. 165; *Huntley* v. *Territory*, 7 Okl. 60, 54 Pac. 314; *State* v. *McQuaige*, 5 S. C. 429; *Dolan* v. *U. S.*, 116 Fed. 578, 54 C. C. A. 34;

*U. S.* v. *Schneider,* 21 D. C. 387; *People* v. *Weil,* 40 Cal. 268;
*Grand Lodge* v. *Taylor,* 99 Pac. 570; *Robinson* v. *Randall,* 82
Ill. 521; *Railway Company* v. *Chance,* 57 Kan. 40, 45 Pac. 60;
*Houghton* v. *Mkt. St. Ry. Co.,* 1 Cal. App. 581, 82 Pac. 972.)
Of course, if defendant had exercised all its peremptory chal-
lenges, and succeeded in removing all jurors which it deemed
objectionable, and it was entirely satisfied with the jury as
composed, and did not desire to exercise another peremptory
challenge, under such circumstances, though error, it might
not be considered reversible error.

2.   Defendant assigns as error that the damages awarded
by the jury were excessive, and were given under the influence
of passion and prejudice.   The very nature of the proposition
involved makes it manifest to any one who gives the subject a
moment's reflection that there can be no fixed rule as to the
amount of damages a person may be entitled to in cases of
this character, and that every case must be considered sepa-
rately, and all the conditions and circumstances surrounding
the accident and the injured party investigated· and viewed in
the light of the testimony given at the trial, before the amount
of damages awarded an injured party can be determined as
being just or excessive, or whether the verdict was influenced
by passon or prejudice.   This court, recognizing the solemnity
of the verdict of twelve jurors, to whom, under our system of
jurisprudence, is awarded the special province of determining
the amount of compensation which should be given a plaintiff,
has, very succinctly we believe, laid down the proper rule for
appellate courts to follow in consideration of verdicts, in the
following language: "There being no absolute fixed legal rule
of compensation, appellate courts ought not to interfere with
a verdict, unless it clearly appears that there has been such a
mistake of the principles on which the damages were esti-
mated, or some improper motive of bias indicating passion or
prejudice upon the part of the jury." (*Solen* v. *Railway Co.,* 13
Nev. 138.)   The same rule was laid down by this court in
*Taylor* v. *Nevada Ry. Co.,* 26 Nev. 415, where a verdict of
$15,500 awarded by the jury was sustained.

The Supreme Court of California, in *Aldrich* v. *Palmer,* 24
Cal. 516, speaking upon this question, stated: "In actions

for personal torts the law does not attempt to fix any precise rules for the measure of damages, but from the necessity of the case leaves their assessment to the good sense and unbiased judgment of the jury. Their verdict, as in all other cases, is subject to review by the court, but it will never be disturbed unless the amount of damages is obviously so disproportionate to the injury proved as to justify the conclusion that the verdict is not the result of cool and dispassionate consideration of the jury. * * * Hence the courts have always sparingly exercised the power of granting new trials in such cases. Where the law furnishes no rule of the measure of damages, their assessment is peculiarly within the province of the jury, and the court will never interfere with the verdict merely on the ground of excess. Upon such question the court has no right to substitute its opinion for that of the jury, merely because it happens to differ from theirs." (*Christensen* v. *Floriston P. Co.*, 29 Nev. 552; *Powell* v. *N. C. & O. Ry.*, 28 Nev. 305.)

The case under consideration was tried before three juries, each composed of twelve men, and in each of the trials a unanimous verdict was returned in favor of the plaintiff. The accident occurred nearly six years ago, and a suit for the recovery of damages for injuries sustained was first instituted in a Utah court, wherein a verdict of $7,000 was awarded the plaintiff. This suit was reversed, and the action dismissed in the Utah court without prejudice. It was thereafter reinstituted in the District Court of Humboldt County, Nevada, and on motion of the plaintiff was remanded to the federal court, wherein it was tried before Judge Hawley, sitting with a jury, and a verdict for $18,000 returned in favor of the plaintiff. This trial was nullified by the Circuit Court of Appeals on jurisdictional grounds (152 Fed. 168, 82 C. C. A. 34), and the cause remanded to the district court, wherein a verdict for $20,000 in favor of the plaintiff was rendered, two years after the $18,000 verdict. The plaintiff at the time of the accident was a man thirty-seven years of age, in the employ of the defendant, earning from $95 to $100 per month. The evidence showed that he had occupied several positions for the defendant in the repair department, then

as switchman, night switchman, day switchman, and finally
as foreman of one of the crews, and that he was gradually
advancing in his positions in the employ of the defendant.
The evidence also disclosed that he had temporarily acted as
yardmaster for the defendant.

Plaintiff testified that he was torn from the caboose and
thrown down upon the track, and that the cars ran over his
left leg and right foot, and that he became unconscious; that
it ran over his left leg just below the knee, and diagonally
across the toes of the right foot, being the big toe and the next
two adjoining it; that he was picked up, and put into the
caboose, where he remained until he was placed on one of the
passenger trains, and went to the company's hospital in San
Francisco.   There his left leg was amputated three inches
above the knee, and three toes of his right foot were also
amputated.   The amputation of the leg above the knee was
about three inches above the knee joint.   The toes were all
taken off at the body of the foot, being the big toe and the
next two toes to it.   He was in the hospital about four months.
He further testified that he was not as strong as he used to be;
that he was weaker physically. "I feel a decline falling upon
me, and I am not able to accomplish anything as I undertake
to do in the way of work, or to do anything, so that I know
I am handicapped that way physically." He weighed about
fifteen to eighteen pounds less than at the time of the acci-
dent.   He testified that he could wear an artificial leg at times,
but that it irritated the stump and made it sore, and that he
had to lay it aside to get relief.   That when he walks his
right foot pains him severely if he is on it a while, and that
he has to rest and relieve the weight on it.   That since his
injury he only began to earn anything about a year prior to
the time of the trial, when he secured a star mail route run-
ning from Ogden to Ogden Valley, a distance of nineteen miles
one way.   That his contract figures for this position were $60
a month or about $700 a year.   That he is required to have
four horses and wagon, running two teams practically, and that
after feeding his horses and paying expenses, etc., he earns $12
or $15 a month net.   That he owns a small place, eleven and

a half acres of farming land, hay, and grain just outside of Ogden, from which he derives about $150 per year.

Dr. Samuels, a witness for the defendant, and whose evidence had never been introduced in any of the former trials, testified that he was called to wait upon Burch, and found him lying upon the floor of the caboose at the depot. That his left leg was crushed from the ankle to the knee. That the muscles were torn completely loose from the bone of the left leg. The flesh was broken open, and the whole business was lacerated and torn to pieces; all injured, torn, and lacerated and full of cinders. That there were shreds of flesh there. He was bleeding moderately. That the more laceration there is the less chance there will be for a hemorrhage. That he removed his clothing, dressed the leg, washed all the cinders out; the cinders being mixed with dirt. That there was plenty of roadbed in the leg. He used hot water and bichloride of mercury, and cotton for a sponge, allowing the water to run over the injury. He also used a swab to swab out whatever dirt he could, and after cleaning it he dressed it, and applied a rubber bandage above the knee to control the hemorrhage and prevent any further bleeding. The right foot was crushed, and he treated that precisely as he did the leg, having had the shoe and stocking removed. That the right foot was crushed so badly that he told a bystander and the plaintiff that there was no possibility of saving the foot. That opinion was formed from the condition of the foot at the time. There was some shock, and plaintiff was suffering pain, and he gave him some medicine to relieve the pain, but that while he was dressing the wounds plaintiff had no medicine, and that he undoubtedly suffered pain even after the leg was taken off.

In passing upon this same point urged by appellant against the $18,000 judgment rendered in the circuit court, Judge Hawley, in denying the motion for a new trial, said: "It must be admitted that the jury were exceedingly liberal in the amount of damages allowed and marched up near the border line; but I do not feel authorized to say that the amount is so excessive as to indicate passion or prejudice on the part of the jury,

which seems to be the only ground that gives authority for the court to interfere with the amount of a verdict." (*Burch* v. *Southern Pacific*, 145 Fed. 443.) There is a line of authorities which support the following rule stated in 3 Cyc., at page 355, in the following language: "As a general rule, after two or more successive and concurring verdicts, the appellate court will be strongly disinclined to interfere with the last verdict, and findings under such circumstances are usually accepted as final if the evidence is conflicting, and there are any tending to support the verdict, unless it is plain that the verdict is founded on evidence which does not tend to prove a material fact necessary to a recovery, or is in palpable disregard of the evidence." (*Todd* v. *Demeree*, 15 Colo. 88, 24 Pac. 563; *Browns* v. *Lutin*, 16 Colo. App. 263, 64 Pac. 674; *Egbers* v. *Egbers*, 177 Ill. 82, 52 N. E. 285; *Jacksonville Ry.* v. *Neff*, 36 Fla. 584, 18 South. 765; *Windsor* v. *Cruise*, 79 Ga. 635, 7 S. E. 141; *Davis* v. *Smith*, 30 Ga. 263; *Gruver* v. *Dixon*, 85 Ill. App. 79; *Chicago Ry.* v. *Kelly*, 80 Ill. App. 675; *Hill* v. *Bahrns*, 158 Ill. 314, 41 N. E. 912; *Peacocke* v. *Mauck*, 42 Ind. 478; *Ross* v. *Ross*, 5 B. Mon. 20; *Meguiar* v. *Feslar*, 42 S. W. 920; *Haycroft* v. *Walden*, 14 Ky. Law Rep. 892; *Louisville Ry.* v. *Connelly*, 7 S. W. 914; *Womack* v. *Fudikar*, 47 La. Ann. 33, 16 South. 645; *Bowman* v. *Flower*, 11 La. 513; *Brownell* v. *Fuller*, 60 Neb. 558, 83 N. W. 669; *Mo. Pac. Ry. Co.* v. *Fox*, 60 Neb. 531, 83 N. W. 744; *Archer* v. *N. Y. R. R. Co.*, 106 N. Y. 589, 13 N. E. 318; *Cole* v. *Fall Brook Coal Co.*, 87 Hun, 584, 34 N. Y. Supp. 572; *Ry. Co.* v. *Waldhaur*, 84 Ga. 706, 11 S. E. 452; *McNeil* v. *Lyons*, 22 R. I. 7, 45 Atl. 739; *Duggan* v. *Cole*, 2 Tex. 381; *Daisley* v. *Dun*, 107 Fed. 218; *Russ* v. *Steamboat War Eagle*, 14 Iowa, 363; *Peoria Ry. Co.* v. *Rice*, 46 Ill. App. 60; *Holmes* v. *Jones*, 69 Hun, 346, 23 N. Y. Supp. 631; *Johnson* v. *Hannahan*, 3 Strob. 425; *Giese* v. *Schultz*, 69 Wis. 521, 34 N. W. 913; *Linss* v. *Ry. Co.*, 91 Fed. 964, 965; *Village* v. *Rowe*, 66 Ill. App. 55; *McDonald* v. *Postal Tel. Co.*, 22 R. I. 131, 46 Atl. 407; *Loker* v. *Ry.*, 94 Mo. App. 481, 68 S. W. 373; *Shaw* v. *Boston Ry. Corp.*, 8 Gray, 45.)

While we believe that the rule cited in Cyc., relative to successive verdicts, is a correct rule in so far as it may be considered as a circumstance to be regarded by the appellate court

going to determine the righteousness of appellant's cause, yet in no wise binding upon the court, because a defendant is entitled to have his cause tried any number of times until it is tried in accordance with law and before a fair and impartial jury, the $20,000 verdict in this case, when considered in the light of all the facts and circumstances, is not so great as to convince us that it is excessive, or given under the influence of passion or prejudice, and therefore we do not feel inclined or warranted in disturbing the verdict. (*Railway Co.* v. *Nesbit*, 43 Tex. Civ. App. 630, 97 S. W. 825; *Retan* v. *Railway Co.*, 94 Mich. 146, 53 N. W. 1094; *Williamson* v. *Railway Co.*, 53 App. Div. 339, 65 N. Y. Supp. 1054; *Texarkana Ry. Co.* v. *Toliver*, 37 Tex. Civ. App. 437, 84 S. W. 375; *Railway Co.* v. *Topliff*, 18 Ohio Cir. Ct. Rep. 709; *Strand* v. *Railway Co.*, 101 Minn. 85, 111 N. W. 958; *Fonda* v. *Railway Co.*, 77 Minn. 336, 79 N. W. 1043; *Caldwell* v. *N. J. Steamboat Co.*, 47 N. Y. 282, 297; *Railway Co.* v. *Brazzil*, 78 Tex. 314, 14 S. W. 609; *Smith* v. *Railway Co.*, 92 App. Div. 213, 86 N. Y. Supp. 1087; *Bourke* v. *Butte Co.*, 33 Mont. 267, 83 Pac. 740; *Commonwealth El. Co.* v. *Rooney*, 138 Ill. App. 275; *Mo., K. & T. R. Co.* v. *Bailey*, 115 S. W. 601; *Whitehead* v. *Wisconsin Co.*, 103 Minn. 13, 114 N.W. 254; *Union Pac. R. Co.* v. *Connolly*, 77 Neb. 254, 109 N. W. 368; *Tex. & N. O. R. Co.* v. *Parsons*, 109 S. W. 240, 113 S. W. 914; *Williams* v. *Spokane R. Co.*, 42 Wash. 597, 84 Pac. 1129; *Reeve* v. *Gas Co.*, 152 Cal. 99, 92 Pac. 89; *Railway Co.* v. *Shelton*, 30 Tex. Civ. App. 72, 69 S. W. 653; *Erickson* v. *Brooklyn Ry. Co.*, 11 Misc. Rep. 662, 32 N. Y. Supp. 915; *Ehrman* v. *Railway Co.*, 60 Hun, 580, 14 N. Y. Supp. 336; *Hall* v. *Railway Co.*, 46 Minn. 439, 49 N. W. 239; *Engler* v. *Western Union Tel. Co.*, 69 Fed. 185; *Bugge* v. *Seattle Elec. Co.*, 103 Pac. 825.)

3. Appellant assigns as error the court's permission of plaintiff's counsel to refer in his argument before the jury to the fact that defendant had secured a removal of the case to the United States Circuit Court. The defendant secured a removal of the case from Humboldt County to the Circuit Court for the District of Nevada, upon the ground that both plaintiff and defendant were nonresidents of Nevada. The United States Circuit Court held that defendant was entitled

to such removal.   (139 Fed. 350.)   Subsequently the United States Circuit Court of Appeals reversed the Circuit Court, and held that the federal court had no jurisdiction of the cause.   Thereupon plaintiff had the case remanded to the district court in Humboldt County.

During the closing argument of plaintiff's counsel the following proceedings were had:

Mr. MacMillan—Mr. Shoup stood before you and told you how fair and how square he thought you were—what accomplished jurors he thought you would make; then throwing his hands into the air, and shaking his hands in an eloquent way, he says: 'We are not afraid to bring our witnesses before this jury for this trial where those witnesses have lived. We are not afraid to have the credibility of our witnesses tested by men who have seen them, and have lived here, and who have known them in their daily life.'   Oh, Mr. Shoup, how different is the tale you sing here tonight to the one that you sang here some time ago to this court.   I hold this in my hand which would convict counsel of having changed their minds——

Mr. Shoup—I object to any reference to any record of this case, not in evidence and before the jury.

Mr. MacMillan—Part of the files; and I consider that I have a right to use them before the jury.

The Court—Proceed with the argument.

Mr. Shoup—We except, if your honor please.

Mr. MacMillan—If that was the case, why did he remove it from here to the federal court of the United States, where the jurors of this town in which the witnesses lived would not be called upon to pass upon their credibility?

Mr. Shoup—That is also subject to the same ruling, objection, and exception.   We renew our objection to the statement of counsel, and assign the statement to the jury as error.

Mr. MacMillan—For the purpose of the record, I wish to state that this reply is simply made because Mr. Shoup stated to the jury they were not afraid to submit the testimony of the witnesses to the jurors of this town in which the witnesses lived.

Mr. Shoup—Will the Court rule on the matter?

The Court—I do not think there is any ruling to be made.

Mr. Shoup—To the overruling of such objection we take our exception.

These remarks of plaintiff's counsel were certainly improper, and the trial court should have immediately sustained the objection of the defendant's counsel. While we believe such remarks to be error, yet in this particular case, in view of the fact that the jurors already knew that the case had been removed to the United States court, and in view of the trial court later in its instructions to the jury binding them to return their verdict upon the evidence and the law, which palliated, but did not excuse entirely, the language of respondent's counsel, or the court's failure to promptly check the improper remarks in reference to the cause being remanded, yet we believe, under all the circumstances in the present case, that it was not sufficient to amount to reversible error. It is not every case where the court has considered the remarks of counsel, or the action of the court thereon, to be error that a reversal of the appellate court has been awarded therefor. The question in each case must be determined from its own particular facts.

4, 5. Counsel further complains that the court erred in permitting plaintiff to introduce evidence to the effect that he had complained to Yardmaster Fridley about the defective switch stand, when it was not shown that Fridley had authority to promise that such defect would be repaired, and also that the court erred in permitting evidence to be introduced showing that the yardmaster had authority to hire and discharge employees. We agree with counsel for appellant that the plaintiff, in order to sustain his case, should show that the defective switch stand was the proximate cause of his injury, also that it was incumbent upon him to show that a promise to repair such defect had been made by one representing the defendant, with authority to make such a promise, and further that, relying upon such promise, he had continued in the employ of the defendant. The question arises, if a notice of the defective switch stand was made to the yardmaster and trainmaster, and they promised to cause the same to be repaired, whether or not such notice to these

parties in authority and their promise was of such a character as to bind the defendant. After a careful review of the evidence and the authorities we are impressed conclusively that if such a notice was given to these parties, and they promised to see the defect remedied and failed to do so, their action in not so doing was sufficient to render the defendant liable for any damages which might occur by reason of their failure.

When the case was before the circuit court on a motion for a new trial, Judge Hawley, in passing upon the authority of the yardmaster to order repairs or cause them to be made, in denying the motion (145 Fed., at page 444, *et seq.*), said:

"At the trial I was impressed by the testimony of the witnesses that there was some conflict as to whether or not the yardmaster was given authority to make repairs when notified that anything in his department was in a defective and dangerous condition. Mr. Burch, the plaintiff, testified:

"Q. To whom had you made that report (defect of the switch stand)? A. To the yardmaster on one occasion when working by the switch.

"Q. Who was the yardmaster you made the report to? A. Mr. Fridley, William Fridley, I believe.

"Q. Do you know what the duties of the yardmaster were? A. Well, he has to exercise a general jurisdiction over the yard work.

"Q. Does he hire and discharge men? A. Yes, sir.

"Q. Does he have authority to order repairs? A. Yes, sir.

"Q. I will ask you, do you know of your own knowledge whether the yardmaster ever ordered repairs? A. Yes, sir.

"Q. You say you know of your own knowledge of the yardmaster giving orders for repairs? A. Yes, sir.

"Q. Do you know whether afterwards the repairs were made? A. Yes, sir; they were afterwards made.

"Mr. Fridley, the yardmaster, testified as follows:

"Q. As yardmaster there will you explain to the jury what your duties were? A. I was supposed to look after the business that was carried on in the yard there during these particular hours that I was on duty, and to hire and discharge the men.

"Q. Was one of your duties to order repairs made?    A. Yes, sir.

"Q. You never had any specific instructions as to what your duties were out there in the yard?    A. No, sir.

"Q. And you assumed the duties there that you had seen other men assume?    A. Yes, sir.

"Q. Was that the custom there in that yard?    A. Yes, sir.

"Q. That the yardmaster gave instructions for repairs?    A. Yes, sir.

"Q. And you followed out that custom?    A. I did, sir.

"Without quoting any further testimony I am still of the opinion that there was sufficient evidence to justify the leaving of this question to the jury.    *   *   *   The charge given by the court in *Parody* v. *Chicago M. & St. P. Ry. Co.* 15 Fed. 205, 206, supports the instruction under review.    Judge Nelson, among other things, said: 'There is evidence tending to show that the drawbar was an improper one, and not in ordinary use by the company in the yard, that the switch engine on which plaintiff worked when first employed did not have it attached, and that shortly after he worked upon this engine he complained to the yardmaster, telling him that it was dangerous, who promised to remove it, but did not, and that he remained at work after complaint and unfulfilled promise until he was injured.    In regard to the notice required to inform defendant of this, it is sufficient that notice was given to that agent or servant of the defendant who made a requisition for the appliances necessary to be used in the yard of the defendant, and whose duty it is to guard against injurious consequences of  defects in  the particular  appliances used therein.    Such a person is the yardmaster.    He represents the company, and since it delegated to him the authority to make requisitions for engines, etc., for the use of the yard, notice to him of dangerous drawbars will be notice to the defendant.    He is the proper person; and, if after such notice he promised to remedy it, a failure to do so is the negligence of the defendant.' In *Pieart* v. *Chicago R. I. & P. Ry. Co.*, 82 Iowa, 148, 159, 47 N. W. 1017, 1019, the court said: 'But plaintiff claims that deceased protested against using the engine without such

board, and that the agent of the defendant promised that that engine should soon be removed, and that deceased should not be required to work but a short time with it, and, by promises and assurances given, induced him to continue in his position as switchman. Appellant contends that there is evidence of such promise, and that the court erred in submitting that question to the jury. Numerous authorities are cited to show that there must have been an express or implied promise, and, upon the other hand, that a mere assurance upon which the employee relied is sufficient. If, upon objection to the employer or one authorized to act for him, the employee is given to understand that the defect will be remedied, he has the right to act upon that assurance. This brings us to inquire whether complaint was made to one having authority in such matters. The two conversations relied upon were with Cain, the yardmaster, under whose orders deceased performed his duties as switchman. It appears that the yardmaster had no authority to direct repairs on the engine, but if an engine furnished him was lacking some appliances necessary for switching, it was his duty to report to the trainmaster, who would determine the advisability of furnishing whatever was required. We think under this showing the yardmaster was the proper person to whom deceased should complain. * * * Defendant's business is transacted by many officers, agents and servants of different grades. It being the duty of the yardmaster to report such complaints to another, the complaint was properly made to him, though he may not have had the authority to remedy the difficulty complained of. * * * No particular form of words is required to constitute a complaint or assurance. If by any acts or expressions the deceased gave the proper agent of defendant to know that he was unwilling to continue in the employment without running boards on the engine, that was a sufficient complaint; and if by any acts or expressions the agent gave the deceased person to believe that running boards would be furnished, that was a sufficient assurance or promise. * * * If such assurance were made, and deceased was induced thereby to continue in the employment, then, as we have seen, the defendant assumed the risks incident to the performance of the work without running boards

until such boards should be furnished. The foregoing views of the law are so uniformly sustained by the authorities that we do not deem it necessary to make citations. We think there was no error in submitting the inquiry as to the complaint and promise or assurance to the consideration of the jury.'

"In 1 Labatt on Master and Servant, cited by the defendant at section 420, under the head of 'Whose Promise is Binding on the Master,' the author said: 'The question whether the employee in question was authorized to make the alterations requisite to secure the servant's safety is for the jury, whenever evidence has been adduced which is reasonably susceptible of the construction that he was so authorized.' "

In the present case we believe the testimony upon these points was even stronger than in trial before Judge Hawley. Mr. Burch, the plaintiff, testified in part upon these questions as follows:

Q. Do you know whether while you were working there, whether the yardmaster ordered repairs to be made, and if the repairs were made in pursuance of those orders? A. Yes, sir.

Q. Do you know of your own knowledge whether or not the yardmaster hired and discharged employees? A. Yes, sir; I do.

Q. Did he? A. Yes, sir.

Q. Do you know who was the head officer of the Southern Pacific Company at Winnemucca, who represented the company here? A. Yes, sir.

Q. Who was it? A. Mr. Kitto, the station agent. * * *

Q. Now will you explain to the jury, when that caboose came along there, how you made your mount on the steps? A. Well, I made the mount in the usual manner as the car came to me. I proceeded to get to that point just southwest as the car came up, and I just judged about the proper distance to get ready to mount the car, and as it came by I grabbed the handhold, and threw my left foot upon the step to mount in the usual manner, and was carried by the switch when I was struck. I was struck by the top part of the switch.

He further testified that he notified the yardmaster that the switch stand was defective and needed to be repaired,

and that' the yardmaster promised him that he would repair it, and that he relied upon this promise; that he also advised Mr. Kitto, the trainmaster and station agent, of the defect in the switch stand; that he was promised by the trainmaster that it would be fixed, and that he also heard the trainmaster direct the yardmaster to have it attended to; that the trainmaster was the head officer of the defendant at Winnemucca, who represented the company; that there was a scar on his hip, back of the hip bone, caused by reason of coming in contact with the switch stand; that at the point where the scar is on his hip, he is five or six inches through; that he relied upon the promise of Kitto, the trainmaster, that he would have the switch stand fixed; that he was never furnished with a copy of the rules, never had a book of rules in his possession; and that he never was required to pass an examination upon the rules.

Mr. Dwyer upon this question testified as follows: I worked for the Southern Pacific Company as yardmaster at Winnemucca, where this accident occurred, for a period of twenty years, and was the yardmaster at the time the accident occurred, though I was temporarily on a vacation.

Without any objection from the defendant he testified that as yardmaster he had full charge of the yards at Winnemucca.

Q. You may state whether or not all of the duties of the yardmaster which you exercised during the twenty years you were yardmaster of the defendant company here at Winnemucca were prescribed by the book of rules. A. No, sir.

Mr. Dwyer also testified that during the time he was yardmaster up to the time of this accident, as such yardmaster he frequently employed and discharged switchmen in the Winnemucca yards; that during the time he was yardmaster, and up to the time that Mr. Burch received his injury, it was the custom of the yardmaster in the Winnemucca yards to order repairs made of anything that was out of order or defective; that there was no general rule, and that there was no special rule under the head of "Duties of Yardmaster" in the book of rules, which provided or prescribed the duties of the yardmaster with reference to repairs or in regard to ordering repairs. The duties which were prescribed in the book of

rules did not include any duties with reference to repairs being made.

Q. Then I will ask you to state whether or not you did, during the time that you were yardmaster, up to the time of this accident to the plaintiff, when the plaintiff was injured, order repairs to be made.   A. I most certainly did, sir.

Q. Who was in immediate charge of the switchmen in the yards at Winnemucca during the time you were employed there?   A. The yardmaster.

Q. To whom were the switchmen required to report during that time?   A. In what way?

Q. In any way.   A. To the yardmaster concerning their duties.

Q. Concerning their duties or anything they had to do about the yards?   A. Yes, sir; their work.

Q. Now, when the night yardmaster was present in the yard, state whether or not his duties were the same as those of the day yardmaster?   A. Yes, sir.

Q. And if there was a temporary yardmaster placed in charge of the work, what, if any, difference was there in the duties he had to perform?   A. No difference.

Q. The same duties as the regular yardmaster?   A. Yes, sir.

Q. And the same authority?   A. Yes, sir; same authority.

Q. When you ordered repairs to be made, state whether or not they were made?   A. Yes, sir.

The testimony of Mr. Dwyer, found on page 269 of the transcript, to the effect that while he was yardmaster he ordered repairs to be made, and the testimony found on pages 262 and 270 to the effect that the yardmaster had full charge of the yards at Winnemucca, and that the switchmen were required to report to the yardmaster, was all introduced without any objection on the part of the defendant.

Mr. Dwyer further testified, on pages 298, 299, and 300 of the transcript, that while he was yardmaster at Winnemucca up to the day of the accident, it was the general practice of the yardmasters in the Winnemucca yards to employ and discharge men, and that it was, during such period of time, the general practice of yardmasters to order repairs to be made where defects were found in the yards, such as switch stands;

and on page 301 of the transcript he further testified that, while he was employed as yardmaster up to the date of this accident, he had ordered repairs to be made of defective switch stands in the yards at Winnemucca whenever the occasion required it, and that he did this quite often; that the yardmasters who were generally employed in the yards up to the date of this accident other than himself also ordered repairs to be made; that the directions to make the repairs would be given by the yardmaster to representatives of the department that made the repairs on track equipment, the section foreman in charge at Winnemucca.

Q. State whether or not, when orders were given by the yardmaster to make these repairs that you have testified to, if the repairs were made. A. There certainly was no question in regard to that.

Mr. Dwyer also testified that, when the yardmaster employed men or discharged men, reports were made direct to the superintendent of their action in that regard, and that the action of the yardmaster in employing and discharging men was invariably sustained, provided their personal records went through and proved to be all right; that when the yardmaster employed men they would continue in their employment after the superintendent was notified just the same as though the men were employed at the superintendent's office. Mr. Dwyer further testified that Mr. Kitto, the station agent and trainmaster at Winnemucca, at and prior to the time of this accident, had the right to employ and discharge men, and also that he ordered repairs to be made where defects were found in the yards during that period of time, and that when repairs were ordered to be made by him, they were made without question. Further Mr. Dwyer testified without objection from the defendant, and on cross-examination of defendant's counsel, that he had the authority and right to discharge the section foreman in the yards at Winnemucca.

Mr. Riley, who was the section foreman at Winnemucca at the time of this accident and for many years prior thereto, testified as follows:

Q. You were not under the control of Mr. Kitto? A. No, sir.

Q. The trainmaster or agent?   A. Not exactly; no, sir.

Q. You were under his control to this extent: If he directed you to make repairs to switch stands, you would have to do it?   A. Exactly, if it was out of fix.

Q. And if the yardmaster directed you to make repairs to a switch stand, you would have to do it?   A. Yes, sir.

Q. And it was your duty to do it?   A. Yes, sir; if he reported it to me, of course I would.

This testimony was introduced without any objection from the defendant.

Mr. Thomas Fitzgerald, who at the time of the accident was the resident engineer and assistant superintendent of the Southern Pacific Company over the division from Wadsworth, Nevada, to Ogden, Utah, and who resided at that time at Ogden, Utah, testified as follows:

Q. Then will you state whether or not it would be the duty of the yardmaster to order repairs made in the yards at Winnemucca, particularly such as a defective switch stand?   A. It might be his duty to report it.

Q. To whom?   A. To the section foreman.

On cross-examination Mr. Fitzgerald further testified as follows:

Q. And now, then, as assistant superintendent, you performed the duties of the superintendent?   A. Yes, sir.

Q. And if the switchman had any complaint to make, he should make it to the yardmaster, and then the yardmaster would send it to you?   A. No, sir; the yardmaster didn't deal direct with me, not while there was a trainmaster there, as he was at the head of it?

Q. Doesn't your rules prescribe that the yardmaster is under the direction of the superintendent?   A. He is under the direction of the superintendent.

Q. And should make reports to him?   A. In this case he made it through the trainmaster.

Q. Is there any rule, or have you any rule, where the yardmaster should make reports to the trainmaster?   A. The trainmaster, the trainmaster of Winnemucca, was appointed; he was appointed there to take charge of the yards and station, and the yardmaster should report to him direct.

Q. Well, it was the custom in that yard if the switchman had to make any complaint, he would make it to the yardmaster, his immediate superior, would he not?  A. Yes, sir; to the yardmaster or to the trainmaster—either.

Q. Who was Mr. Kitto?  A. Mr. Kitto was the trainmaster.

Q. And the station agent?  A. Yes, sir.

Q. Did he have control over Mr. Riley?  A. No, sir.

Q. Could he not order and direct him to do anything? A. He could not direct him in his general work.  If there was something wrong, he could tell him to go and fix it.

Q. It would be the duty of Riley to do it?  A. Yes, sir.

Q. And so in that case Mr. Kitto, as the trainmaster and agent, could direct and order the section foreman to make repairs?  A. Yes, sir.

Mr. Fitzgerald further testified that there were a great many repairs that could be done in the yards at Winnemucca, and not be reported to himself as resident engineer or assistant superintendent, or to the trainmaster; that such was customary in those yards in the year 1903, and, further, that Mr. Kitto had the right to employ and discharge men.  He further testified as follows:

Q. And Mr. Kitto had a right to order repairs to be made? A. Yes, sir.

Q. And he had that authority in the year 1903?  A. Yes, sir.

On the question whether it was the yardmaster's duty to order repairs to be made he further testified as follows:

Q. It would be his duty to order repairs to be made if it was necessary for the security of those yards?  A. It was his duty to report it.

Q. To whom?  A. The section foreman.

Q. And upon that report the repairs would be made? A. Yes, sir.

Mr. Fitzgerald also testified that if the yardmaster should report a defect to the section foreman, and request him to remedy it, and the section foreman should refuse so to do, it would then be the duty of the yardmaster to report it to the superintendent, whereupon the section foreman, refusing to do

his duty, would be discharged or disciplined.   And further on page 433, as follows: "Q. Is it not customary, and is it not the duty in those yards, for an inferior to report to their immediate superiors?   A. Yes, sir."

In the case of *Swift* v. *O'Neill*, the Supreme Court of Illinois, speaking on this question, said: "Manifestly, in a case of this kind, the defendant being a corporation, and acting only through agents, there must be found somewhere among its employees persons who so far represented it that notice to them, and their promises, will be binding on the master.   And while we are not prepared to say the evidence is entirely satisfactory to that effect, yet we do not think that it so far tended to prove that the superintendent occupied such a position, and that he was notified of the plaintiff's complaint, and promised to furnish additional lights, as that the question was properly submitted to the jury." (187 Ill. 337, 343; 58 N. E. 416, 417.)

In the case of *Homestake Mining Co.* v. *Fullerton*, 69 Fed. 923, 928, 929, 16 C. C. A. 545, 550, 551, the contention was made that a promise, given by the foreman of the mine, to have repairs made was insufficient, for the reason that the evidence did not establish authority in such foreman to promise repairs.   The court, speaking through Circuit Judge Thayer, answered this contention as follows: "We apprehend that if it was fairly within the scope of Treweek's authority, as foreman, to cause a board covering to be placed over the coupling of the line shaft, then a promise made by him to a subordinate servant to cover the coupling, in response to a complaint that it was dangerous, must be given the same effect as a like promise made by the defendant itself.   And it must be conceded that a like promise made by the defendant would serve to rebut the presumption that the plaintiff intended to assume the risk which he had pointed out.   The question is not whether Treweek was a vice-principal in such sense that the defendant would be liable to its employees for all of his negligent acts, but whether his functions were such that he had the right, in the discharge of his duties and in the exercise of his judgment and discretion, to cause the shaft coupling to be covered.   If he had such right, then we think that the plaintiff could properly address his complaint to

Treweek, and rely on the latter's promise to remedy the existing defect without preferring his claim to, or seeking a promise from, any one higher in authority."

And, continuing, Judge Thayer further said: "It was an act which did not require a previous conference either with the general superintendent or the master mechanic, because it did not involve any alteration of the machinery, or interfere to any extent with its operation. When the defendant company appointed Treweek as its foreman, it no doubt intended that he should exercise his judgment and discretion with respect to the propriety of placing a covering over the exposed parts of the machinery, of which complaint was made to him that they endangered the safety of those employees who frequently had occasion to pass in close proximity to the same. Unless he had such authority in his capacity as foreman, he would be powerless to guard the company's interest as it is doubtless expected that they would be guarded. At all events, we entertain no doubt that it was within the apparent scope of Treweek's authority to hear complaints touching such a defect as was pointed out by the plaintiff, and that it was also within the apparent scope of his authority to promise that it would be remedied."

In the case of *Ray* v. *Diamond State Steel Co.*, 2 Pennewill (Del.) 525, 528, 47 Atl. 1017, 1018, the court held that: "Notice of defects given to the foreman having charge of that particular work and department is notice to the company, and a promise to remedy the defect, made by such foreman, is a promise of the company in law."

In the case of *Chapman* v. *S. P. Co.*, 12 Utah, 40–41, 41 Pac. 551, 555, where the same question was involved, the court stated: "In other words, whoever represented the defendant there on the ground at that time, if notice was given to such person of such defect, that would be notice to the defendant; and if a promise to repair it was made by that person, that would be the promise of the defendant, within the meaning of the instruction I have already given you. In the absence of Whalen, McComie represented the defendant, and his negligence in the construction of the platform would be the negligence of the principal. (*Andreson* v. *Depot Co.*;

8 Utah, 128, 30 Pac. 305; *Reddon* v. *Railway Co.*, 5 Utah, 344, 15 Pac. 262; *Ryan* v. *Bagaley*, 50 Mich. 179, 15 N. W. 72, 45 Am. Rep. 35; *Railroad Co.* v. *Stevens*, 20 Ohio, 415; *Railroad Co.* v. *Babcock*, 154 U. S. 198, 14 Sup. Ct. 978, 38 L. Ed. 958; *Malone* v. *Hathaway*, 64 N. Y. 5, 21 Am. Rep. 573.)"

We believe it to be a question of fact for the jury to determine in the light of all the evidence whether or not the yardmaster and trainmaster had authority to make such a promise as would bind the defendant, and whether or not notice of the complained-of defect was made to them, and, if so made, they promised to have the same repaired. We believe the testimony unquestionably sufficient to sustain the verdict of the jury that the yardmaster and trainmaster had authority to cause defective switch stands to be repaired, and that in being notified and promising, but failing, to have the same repaired, they rendered the defendant liable for such damages as could be legally proven to have arisen by reason of this neglect. We do not believe that the court erred in permitting evidence to be introduced showing that the yardmaster had authority to hire and discharge employees.

Judge De Haven very tersely, and we believe correctly, states the law in the case of *In re Calif. Nav. & Imp. Co.*, 110 Fed. 673, upon Master and Servant as follows: "A master employing a servant impliedly engages with him that the place in which he is to work, and the tools or machinery with which he is to be surrounded, shall be reasonably safe. (*Railroad Co.* v. *Baugh*, 149 U. S. 368, 386, 13 Sup. Ct. 914, 921, 37 L. Ed. 772, 780.) * * * The master cannot escape from the obligation of his positive duty by the delegation of its performance to an agent or servant employed by him. * * * That such is the law upon this point is well settled. (*Hough* v. *Railway Co.*, 100 U. S. 213, 25 L. Ed. 612; *Fuller* v. *Jewett*, 80 N. Y. 46, 36 Am. Rep. 575; *Ford* v. *Railroad Co.*, 110 Mass. 240, 14 Am. Rep. 598.)"

This court in the case of *Taylor* v. *N. C. O. R. R. Co.*, properly laid down the following rule: "The general rule applicable to cases of this character, established by the great weight of authority, is that if the servant, noting a defect in the machinery, complains to the master of such defect, who prom-

ises that such defect shall be remedied, the servant may, in reliance upon the promise, continue in the service for a reasonable time thereafter without thereby assuming the risk, provided the danger is not of so imminent and immediate a character that a person of ordinary prudence would refuse to continue in the service." (26 Nev. 415, 427.)

The transcript discloses sufficient testimony to have warranted the jury in finding that the defendant authorized the yardmaster and trainmaster to employ men and make repairs such as fixing defective switch stands in the yard, and this authority naturally carried with it the right to promise, on behalf of the defendant, to repair defective machinery for those whom they employed, and it necessarily therefore follows that Burch, having been employed by those in authority to employ men for the defendant, and they having been notified as the authorized representatives of the defendant of the defective switch stand, and having authority to repair it, and promising to do so, but neglecting it, and plaintiff, relying on that promise, continuing to work for the defendant, it became the duty of the defendant to have remedied the defective switch stand, and by reason of its neglect in not so doing, it is responsible in damages to the injured employee. (*Dells Lbr. Co.* v. *Erickson*, 80 Fed. 257, 25 C. C. A. 397; *Chicago Housewrecking Co.* v. *Birney*, 117 Fed. 72, 54 C. C. A. 458; *Barney Dumping Boat Co.* v. *Clark*, 112 Fed. 921, 50 C. C. A. 616; *Cunard Steamship Co.* v. *Carey*, 119 U. S. 245, 7 Sup. Ct. 1360, 30 L. Ed. 354; *Lyttle* v. *Railway*, 84 Mich. 289, 47 N. W. 571, 573; *Eureka Co.* v. *Bass*, 81 Ala. 200, 8 South. 216, 218; *Boyd* v. *Blumenthal*, 3 Pennewill, 564, 52 Atl. 330; *Simone* v. *Kirk*, 173 N. Y. 7, 65 N. E. 739; *Vogel* v. *Bridge Co.*, 88 App. Div. 68, 84 N. Y. Supp. 799; *Hair Co.* v. *Mueller*, 203 Ill. 558, 68 N. E. 51, 52; *Jernigan* v. *Ice Co.*, 33 Tex. Civ. App. 501, 77 S. W. 260; *Ætna Indem. Co.* v. *Ladd*, 135 Fed. 637, 68 C. C. A. 274; *Stephens* v. *Railway*, 86 Mo. 221; *St. Louis Railway Co.* v. *Holman*, 53 Ill. App. 617; *Kane* v. *Railway Co.*, 128 U. S. 91, 9 Sup. Ct. 16, 32 L. Ed. 339.)

6. The appellant assigns as further error that the court erred in refusing to give to the jury defendant's Instruction No. 4, which reads as follows: "If you believe that the plain-

tiff attempted to jump onto the forward end of the caboose coming towards him while going at a rapid speed, and that the same was forbidden by the rules of the company and that plaintiff knew of that rule, then you must find for the defendant."

The following instruction given by the court, in view of the evidence in the case, we believe, relieves the court from any error in refusing to give the instruction requested: "If you believe that plaintiff attempted to jump on the forward steps of the caboose coming towards him, while going at a speed of about eight miles an hour, and that such act was forbidden by the rules of the company, because of its being too high a rate of speed to allow a switchman to board an approaching caboose, and that the plaintiff knew, or working in the capacity of a switchman it was his duty to know, of that rule, and you also believe from a preponderance of the evidence that the said rule was generally observed by the switchmen employees of the defendant corporation, and was generally enforced by the officers in authority for said corporation, then you should find for the defendant."

Instruction No. 14 given by the court also relieves the refusal of the court to have given the instruction proposed, as the instruction as given and this instruction fully covers the law in accordance with the issues raised by the pleadings and evidence in the record.

Defendant introduced in evidence the following rule which it maintained and claims relieved it from liability in the present case:

"Every employee is required to exercise the utmost precaution to avoid injury to himself or to others, especially in the switching or other movement of trains.

"Employees are warned not to attempt to get on the front or rear of an engine, or on the end of a car as it approaches them, or to jump on or off trains and engines in rapid motion, or to go between cars in motion to uncouple them. These and all similar imprudent acts are forbidden."

The evidence in this case discloses that it was the custom and practice for switchmen and other employees to mount running cars at the place of the accident, at the time, and for

years prior to the time of, the accident.   Mr. Dwyer, who was
yardmaster and had full charge of the yard at Winnemucca,
so testified, and also testified that it had been frequently done
in the presence of the superintendent, assistant superintendent,
and the trainmaster.   So also did defendant's witnesses Williams and McDermott testify such to be the custom and practice.   The assistant superintendent and trainmaster referred
to by Mr. Dwyer were called and testified, but neither denied
the custom or the testimony of Mr. Dwyer.   Mr. McDermott,
defendant's witness, testified to this custom.   So also did
defendant's witness Williams.   It was not error for the court
to have permitted evidence tending to show that this rule was
commonly violated and not enforced, and that those in authority for the railroad acquiesced by their nonenforcement of the
rule in commonly and notoriously allowing it to be violated,
without any action on their part to enforce its provisions.
Defendant, therefore, in the present case, was not in position
to shield itself of any liability by pleading this rule.   (*Hunn* v.
*Railway*, 78 Mich. 513, 44 N. W. 505, 7 L. R. A. 500; *White* v.
*Railway*, 72 Miss. 12, 16 South. 249; *Lowe* v. *Railway*, 89 Iowa,
420, 56 N. W. 521; *Horan* v. *Railway*, 89 Iowa, 328, 56 N. W.
508; *Strong* v. *Railway*, 94 Iowa, 380, 62 N. W. 801; *Barry* v.
*Railway*, 98 Mo. 62, 11 S. W. 309, 14 Am. St. Rep. 610; *Railroad Co.* v. *Nickels*, 1 C. C. A. 625, 50 Fed. 718; *Railway* v.
*Springsteen*, 41 Kan. 724, 21 Pac. 776; *Prather* v. *Railway*, 80
Ga. 427, 9 S. E. 530, 12 Am. St. Rep. 263; *Hissong* v. *Railway*,
91 Ala. 514, 8 South. 777; *Bonner* v. *Bean*, 80 Tex. 152, 15
S. W. 799; *Flanders* v. *Chicago Co.*, 51 Minn. 193, 53 N. W.
544; *Lawson* v. *Truesdale*, 60 Minn. 410, 62 N. W. 546; *Wright*
v. *So. Pac. Ry. Co.*, 14 Utah, 383, 46 Pac. 374; *Lowe* v. *Railway*,
89 Iowa, 420, 56 N. W. 520.)

In the case of *Francis* v. *Kansas City Ry. Co.*, 127 Mo. 675,
26 S. W. 846, 847, the court said: "There was no error in permitting plaintiff to prove that it was a common custom and
thing for the switchmen and other employees, after the promulgation of the special order of May 12, 1887, to get on the
footboard of the engine from the front, when it was in motion;
that it was done with the actual knowledge of Smith, the
yardmaster, and Cummings, the foreman of the roundhouse,

and there was evidence that the office of the trainmaster, Jeffries, was in the yards where the men worked, and that he was required by his position often to be in these yards, and was there, and that the men were never reprimanded for breaking the rule. This evidence tended to prove that the rule was habitually violated with the knowledge of the officers of the defendant. It was competent and relevant to show that the rule was not in force, nor is there any merit in the objections to the evidence, tending to show Preston's general incompetency as an engineer, and his ignorance of signals and general incapacity." (See 127 Mo. 658, 30 S. W. 130.)

We cannot say, in view of the evidence and the instruction as given by the court in this case, that because Burch violated this rule, which was commonly not lived up to, and which was not enforced by the defendant or its officers whose duty it was to see that it was enforced, and who knew that it was being commonly violated, the plaintiff was guilty of such contributory negligence as would preclude him from recovering. Undoubtedly the comments of the court when the rule was first introduced in evidence were improper remarks, but in view of the fact that the rules were afterwards admitted in evidence, and the following statement made by the court to the jury upon his remarks formerly made, we believe his remarks do not amount to reversible error:

The Court—Gentlemen of the jury, this is the rule that the court yesterday refused to admit in evidence, and in ruling upon it the court passed some remarks concerning it. I wish you, gentlemen of the jury, to absolutely disregard the remarks of the court yesterday about this rule. It is admitted this morning without objection on the part of the defendant as evidence in this case. The objection will be overruled to the question. Witness, answer the question.

Viewing the evidence and instructions as we do, the other objections of defendant under this assignment of error, if error at all, would be harmless.

7. Appellant assigns as error that the court erred in refusing the following instructions: "The jury are instructed that if they believe from the evidence that plaintiff attempted to board one of the defendant's cabooses on October 26, 1903,

and missed his handhold on said caboose, or his footing upon the step of said caboose, and by reason thereof fell, or was dragged alongside of the track and thereafter fell or struck against the switch stand or target in question, your verdict should be for the defendant."

The court modified this instruction complained of, giving the following instruction, which, in view of the pleadings and the evidence, we believe was proper, and that the court did right in refusing the instruction complained of: "The jury are instructed that if they believe from the evidence that the plaintiff attempted to board one of the defendant's cabooses on October 26, 1903, and missed his handhold on said caboose, or his footing upon the step of said caboose, and by reason thereof fell, or was dragged alongside of the track, and thereafter fell, and such fall resulted in his injury, for which he now brings this suit, your verdict should be for the defendant."

If the instruction complained of had been given as offered by appellant, it would have been practically an instruction for the jury to return a verdict for the defendant. The complaint alleged that the plaintiff struck against the switch stand in question, the answer denied it, and the jury found in favor of the plaintiff.

Counsel for respondent we believe very clearly show the fallacy of this instruction offered by the appellant in their reply brief, wherein they segregate the instruction refused and complained of, as follows: "The jury are instructed that if they believe from the evidence that plaintiff attempted to board one of the defendant's cabooses on October 26, 1903, and (1) missed his handhold on said caboose; (2) or his footing upon the step of said caboose and by reason thereof fell; (3) or was dragged alongside of the tracks and thereafter fell; (4) or struck against the switch stand or target in question— your verdict should be for the defendant." Now, if we leave out the clauses 1, 2, and 3, we have a request to instruct the jury in this language: "The jury are instructed that if they believe from the evidence that plaintiff attempted to board one of the defendant's cabooses on October 26, 1903, and * * * struck against the switch stand or target in question, your verdict should be for the defendant."

This court has repeatedly held that it is not error for a court to refuse to give an instruction which is in part wrong, and may so modify the instruction as to conform to the pleadings. (*State* v. *Anderson*, 4 Nev. 265; *Beaver* v. *Taylor*, 93 U. S. 54; 23 L. Ed. 797; *Thompson* v. *Powning*, 15 Nev. 195.)

The court, however, in Instructions Nos. 5, 6, 7, 8, and 10 sufficiently covered the law and the evidence to protect the defendant's interests. Where the court properly covers the substance of instructions which are asked by counsel but refused, it is not error to refuse to give instructions in the language of counsel, which have already been covered in other instructions given. (*State* v. *Buralli*, 27 Nev. 54; *State* v. *Ferguson*, 9 Nev. 106; *U. P. R. Co.* v. *Jarvi*, 53 Fed. 71, 3 C. C. A. 433; *State* v. *Johnny*, 29 Nev. 204.)

8. Appellant assigns as error that the evidence is insufficient to justify the verdict, and the verdict is against law. The defendant moved the lower court for a new trial in this case, upon the grounds, first, insufficiency of evidence to justify the verdict; second, the verdict is against law. The statute of this state (Stats. 1907, p. 360, c. 164) provides that: "In such case, where it appears that the evidence taken altogether, does not support the verdict, or decision, or judgment, or decree of the court, a new trial shall be granted, or, upon appeal, the case shall be reversed without regard to whether there are express findings upon all the issues, or whether the specifications particularly point out the finding or findings, either express or implied, that are not supported by the evidence or are contrary thereto." Our examination of the record in this case shows that there is substantial evidence to support the verdict of the jury, and we cannot say that there is such a clear preponderance of evidence in favor of the issues of fact as contended by the appellant, and therefore do not feel warranted in setting aside the verdict in this case. Where there is a conflict of evidence on certain points, juries, having the opportunity to observe the demeanor and character of witnesses while testifying, are in nearly all cases better judges of fact than are courts or judges, and their verdict should not be disturbed unless there is a clear preponderance of evidence, or the trial court can say that the jury

were swayed by improper motives from rendering a just verdict upon the evidence adduced at the trial.

As we previously observed elsewhere in this opinion, we believe that the evidence at the present trial was much stronger for the plaintiff's case than in the trial which took place before Judge Hawley, wherein a verdict for $18,000 was rendered in favor of the plaintiff. A motion for a new trial was made before Judge Hawley upon the same grounds as now urged in this assignment of error, and, in passing upon the question in denying the motion, Judge Hawley said: "Can it judicially be said that there was 'a clear preponderance of evidence' against the verdict? The court instructed the jury 'that it devolves upon the plaintiff in making out his case to establish by a preponderance of evidence all of the essential affirmative allegations in his complaint which are denied in the answer.' Again, 'You are the sole judges of the credibility and weight that is to be given to the different witnesses who have testified upon this trial,' and further instructed the jury as to the methods they should use 'in judging the credibility of the respective witnesses in this case, there being a conflict upon some points.' The testimony of the plaintiff was clear, direct, and positive upon all the material points in the case. There was nothing in his manner, conduct, or appearance to reflect upon his credit. It may be admitted, as is claimed, that this could not be said of all the witnesses who testified in his favor. The jury might, under the instructions, have disbelieved, and for that reason have discarded, some of their statements, but this is a matter solely within the province of the jury. The preponderance of the evidence does not depend upon the number of witnesses. This is not the governing question. The truth is there was a direct conflict upon the controlling point as to whether the plaintiff gave notice to an agent of the defendant of the defective switch stand, who was authorized, or whose duty it was, to see that the repairs were made. There was ample evidence to sustain the verdict. In such cases the courts would not, in my opinion, be justified in granting a new trial upon the ground stated." (*Burch* v. *S. P. R. R.*, 145 Fed. 144.)

In *Watt* v. *N. C. R. R. Co.*, 23 Nev. 171, 172 (62 Am. St.

Rep. 772), this court says: "Where there is a substantial con-
flict in the testimony, the appellate court should undoubtedly
not substitute its judgment for that of the trial court, and
should only interfere where, upon all the evidence, it is clear
that a wrong conclusion has been reached." (*Murphy* v. *S. P.
R. R.*, 31 Nev. 120; *Sacramento and Meredith M. Co.* v. *Showers*,
6 Nev. 296; *Solen* v. *V. & T. R. R. Co.*, 13 Nev. 106; *Scott* v.
*Haines*, 4 Nev. 426; *Barnes* v. *Sabron*, 10 Nev. 217, 236; *Winter*
v. *Fulstone*, 20 Nev. 260, 266; *Devencenzi* v. *Cassinelli*, 28 Nev.
222; *Myers* v. *Railroad Co.*, 95 Fed. 406, 414, 37 C. C. A. 137;
*People* v. *Garbutt*, 17 Mich. 9, 97 Am. Dec. 162.)

9.  Appellant assigns as further error that the evidence
shows that any risk arising from the defective switch stand
was assumed by plaintiff.  The rulings we have already made
on questions of fact and law which bear upon this point,
together with the requested instruction of the defendant, num-
bered 11, wherein the court instructed the jury properly upon
the law regarding the liability of the defendant, providing that
if the jury believed from the evidence that the defendant was
notified of the defective switch stand, and promised to repair
the same and did not, etc., make it manifest that there is no
error in this assignment.  (*Taylor* v. *N. C. O. R. R. Co.*, 26 Nev.
415; *Ry. Co.* v. *Moseley*, 56 Fed. 1010, 6 C. C. A. 225; *Walton*
v. *Railway Company*, 56 Fed. 1008, 6 C. C. A. 223.)

10.  Appellant assigns as error that the court erred in
denying defendant's motion for judgment of nonsuit.  One of
the grounds for the nonsuit was that the evidence showed that
whatever injury plaintiff sustained while attempting to board,
or in boarding, any of defendant's cabooses was caused by his
own negligence and fault, and that his own negligence and
fault were contributory to the accident and said injuries, and
that the proximate cause of plaintiff's injuries was the result
of his own negligence and lack of proper care.  The motion
was denied, to which defendant excepted upon the grounds:
First, the evidence failed to show that plaintiff had notified
the proper officials of the defendant of any defect in the
switch stand, and that therefore he assumed the risk arising
therefrom; second, that the evidence shows, without conflict,
that plaintiff was guilty of contributory negligence in attempt-

ing to board the moving caboose at the time, and in the place, and in the manner that he did. The rule has been well established in this and other courts that in considering the granting or refusing of a motion for nonsuit the court must take as proven every fact which the plaintiff's evidence tended to prove, and which was essential to his recovery, and every inference of fact that can be legitimately drawn therefrom, and give the plaintiff the benefit of all legal presumptions arising from the evidence, and interpret the evidence most strongly against the defendant. (*Fox* v. *Meyers*, 29 Nev. 183; *Patchen* v. *Keeley*, 19 Nev. 409; *Hanley* v. *Calif. Bdg. Co.*, 127 Cal. 237, 59 Pac. 577, 47 L. R. A. 597; *Lowe* v. *Salt Lake City*, 13 Utah, 91, 44 Pac. 1050, 57 Am. St. Rep. 708; *Brown* v. *Warren*, 16 Nev. 228; *Railway Co.* v. *Lowery*, 74 Fed. 363, 20 C. C. A. 596; *Ins. Co.* v. *Rhea*, 123 Fed. 9, 60 C. C. A. 103.)

The rule has been well established that a case should not be withdrawn from the jury when reasonable men might fairly differ on questions of fact as to whether or not a plaintiff was guilty of such negligence as to constitute contributory negligence, and the conclusion that follows as a matter of law, unless the testimony is so conclusive as to compel the court to set aside a contrary verdict. (*Solen* v. *Railway Co.*, 13 Nev. 127; *Linden* v. *Anchor Co.*, 20 Utah, 134, 58 Pac. 358; *C. & N. W. R. Co.* v. *De Clow*, 124 Fed. 142, 61 C. C. A. 34; *Texas Ry. Co.* v. *Cox*, 145 U. S. 606, 12 Sup. Ct. 905, 36 L. Ed. 829; *Phœnix Assur. Co.* v. *Lucker*, 77 Fed. 243, 23 C. C. A. 139; *Phœnix Mut. Life Ins. Co.* v. *Doster*, 106 U. S. 32, 1 Sup. Ct. 18, 27 L. Ed. 65; *Conn. Ins. Co.* v. *Lathrop*, 111 U. S. 615, 4 Sup. Ct. 533, 28 L. Ed. 536; *Gunther* v. *Livermore Assur. Co.*, 134 U. S. 116, 10 Sup. Ct. 448, 33 L. Ed. 857; *Haines* v. *McLaughlin*, 135 U. S. 598, 10 Sup. Ct. 876, 34 L. Ed. 290.) In considering this assignment it is worthy to note that in passing upon this same question both Judge Marshall and Judge Hawley, in two previous trials to this, considered the evidence and issues sufficient to submit to the jury. In the light of this rule, and the opinion we entertain and have expressed on the other assignments of error herein considered, we are of the opinion that the trial court did not

err in denying the motion of nonsuit interposed by the defendant.

11.  Appellant's last assignment of error that the court erred in submitting to the jury the question as to whether or not the plaintiff had complained to the proper person about the defective switch stand we have already passed upon adverse to appellant's contention in considering the former assignments of error herein.

After a most careful examination of the record presented in this case, and authorities cited in the able arguments and briefs of both counsel for appellant and respondent, in view of the foregoing reasons assigned, we are of the opinion that the judgment and order of the lower court denying appellant's motion for a new trial should be affirmed.

It is so ordered.